Opinion
 

 CHIN, J.
 

 This case, arising out of the 1977 death penalty law, is before us for the second time. In 1980, a jury found defendant guilty of two counts of
 
 *230
 
 robbery (Pen. Code, § 211),
 
 [1]
 
 one count of attempted murder (§§ 187, 664), and one count of first degree murder (§ 187) with the special circumstance of murder in the commission of a robbery (former § 190.2, subd. (c)(3)(i)). The jury found true allegations that defendant personally used a firearm in the commission of one of the robberies, the attempted murder, and the murder. It returned a verdict of death, and the court sentenced him accordingly. In 1985, we affirmed the judgment of guilt, including the special-circumstance finding, but reversed the judgment of death.
 
 (People v. Phillips
 
 (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423]
 
 (Phillips
 
 I).)
 

 At retrial, the jury again returned a verdict of death. The trial court denied the automatic motion to modify the verdict (§ 190.4, subd. (e)) and entered a judgment of death. This appeal, like the earlier one, is automatic. (§ 1239.)
 

 I. Facts
 

 A.
 
 Prosecution Evidence
 

 The prosecution’s case-in-chief at retrial presented essentially the same evidence regarding the facts of the charged crimes as the first. We review those facts briefly. (See
 
 Phillips I, supra,
 
 41 Cal.3d at pp. 39-42.)
 

 Defendant became acquainted with Bruce Bartulis (the robbery and murder victim) and Ronald Rose (the robbery and attempted murder victim) in September 1977. Rose and Bartulis were in the construction business. In November 1977, defendant offered to allow Rose and Bartulis to participate in a large cocaine purchase if they invested $25,000. They accepted, and Rose gave defendant $10,000 as partial payment. After that, defendant urged them several times to pay the rest of the money. Rose gave him another $1,500 but eventually said they could not deliver any more money. Rose asked defendant to use the amount they had already supplied or return it. Defendant agreed to use the money and take a promissory note for the balance of the $25,000.
 

 In late November or early December 1977, defendant offered to sell Rose and Bartulis some stolen insulation for their business. They agreed to the purchase. On December 7, 1977, defendant told Rose the insulation was available to be picked up in Fresno. He told Rose they should meet him that evening at a gasoline station, and he should bring as much cash as he could. Rose obtained approximately $5,000, mostly in $100 bills, and he and Bartulis drove to Fresno in Rose’s 1977 Ranchero. Rose had an unloaded .44 magnum pistol and some ammunition in the vehicle. The two checked into a
 
 *231
 
 motel, then went to the gasoline station. Defendant arrived about half an hour later in a Toyota, accompanied by his girlfriend, Sharon Colman. Defendant told the two to follow him to another destination, and the group drove away in their separate vehicles. Bartulis drove the Ranchero. Along the way, they stopped briefly for defendant to use a rest room. During the stop, defendant walked to the Ranchero and borrowed a book of matches. The four continued their trip.
 

 Eventually, defendant drove off the freeway, and the vehicles stopped in a vacant area off the road. Colman observed defendant get out of the car, converse with the two in the Ranchero, then return to the Toyota. The conversation did not seem angry. Defendant again got out of the Toyota and walked to the driver’s side of the Ranchero. He leaned inside the driver’s window. Suddenly, Colman heard gunshots. She saw gunflashes and a gun in defendant’s hand and heard Bartulis moaning. Defendant silenced him by striking him over the head with the gun. Defendant leaned further into the vehicle, seemed to look for something, then emerged with a wallet. He walked to the other side of the Ranchero and took Rose’s wallet. He returned to the Toyota and handed Colman two wallets and two handguns, the one he had used in the shooting and another. He told Colman the other gun had been near Rose. Defendant had Colman open the trunk of his car, and he took out a can of gasoline. He poured the gasoline over the Ranchero and its occupants and set them on fire.
 

 Rose was still alive. He had “tried to act like [he] was not [conscious] or aware what’s going on” after being shot, even while defendant poured the gasoline over him. He did not actually see defendant shoot him or pour the gasoline, but he recalled that defendant was alone at the window on the driver’s side, that the shots came from that direction, and that he heard a male voice close to him while he was being searched. When he was set on fire, Rose jumped out of the Ranchero and tried to shed his burning clothing. He got his jacket off. Defendant saw Rose running away. Stating to Colman that Rose was not dead, defendant drove the Toyota at Rose and hit him, cracking the windshield. He and Colman drove away.
 

 Two Madera County Deputy Sheriffs observed the fire at 11:53 p.m. and rescued Rose by covering him with a sheet and extinguishing the fire. Rose survived despite suffering five gunshot wounds and bums over some two-thirds of his body. Bartulis was dead in the Ranchero with a bullet wound through the heart that appeared to be caused by a large-caliber bullet. The deputies found a jacket containing a roll of badly burned currency. At least two of the bills were $100 denomination.
 

 Defendant and Colman drove to Sacramento. The two wallets defendant took from the Ranchero contained only $100 or a little more. Defendant said
 
 *232
 
 that he could not find the money Rose was supposed to have had with him. He commented that “the caliber of his gun was too big because he was too close.” He also said “that he had seen [Rose] leaning forward towards the gun and thought that he was going to cross him on their deal.” In Sacramento, the pair went to defendant’s mother’s home. Defendant told his mother he had been to a dance and on the way home some gravel had cracked his windshield.
 

 Eventually, defendant and Colman went to Salt Lake City, where he was arrested on March 17, 1978. While still at large, he had a number of tape-recorded telephone conversations with Richard Graybill, Colman’s former boyfriend. In one of the conversations, defendant said: “[A] .45 sure did put a big hole right through him. I mean, it didn’t fuck around. It went right through him because I could hear it go through the body of the car after it went through him.”
 

 As aggravating evidence, the prosecution also presented a letter defendant wrote while incarcerated in Salt Lake City that appeared to solicit criminal acts against Graybill, Colman, Rose, and defendant’s mother, who were to testify against him.
 

 B.
 
 Defense Evidence
 

 At the first trial, defendant presented an alibi defense. His theory was “that Colman and Rose and defendant’s erstwhile friend, Richard Graybill (who aided police in their efforts to apprehend defendant) were involved in a conspiracy to fix defendant with the blame for the shootings, which were purportedly committed by Graybill and Colman. Rose’s participation in the conspiracy, it was suggested in argument, might be explained by a desire to avoid the necessity of paying off the $25,000 note or to avoid criminal liability for shooting Bartulis himself.”
 
 (Phillips I, supra,
 
 41 Cal.3d at p. 42, fn. omitted.) Defendant testified that he loaned the Toyota to Graybill in Sacramento the night of the shooting, and that Graybill returned it with a damaged windshield the next morning without explanation.
 

 At the penalty retrial, defendant instead sought to portray the incident as a spontaneous shootout following a business deal gone awry rather than a preplanned, calculated robbery murder. He presented witnesses regarding the investigation of the physical evidence, Colman’s veracity, Rose’s possession of a firearm, Rose’s prior statements, and the possible involvement of others in the transactions among defendant, Rose, and Bartulis. Defendant did not testify.
 

 Defendant also presented mitigating character evidence, much of it about his behavior while on death row. An attorney testified that he had used
 
 *233
 
 defendant in a different capital trial as an expert witness on the prison system, and he found defendant very helpful. Defendant’s conduct was “exemplary.” Some correctional officers testified about his good behavior. One time he warned an officer about a plan to “hit” an officer. A few days later, an officer was in fact stabbed to death. Defendant’s son-in-law testified that defendant had assisted him in starting his business and had developed a “very nice relationship” with defendant’s granddaughter. He testified that defendant’s death would have a “strong” impact on him. A man who employed defendant in the 1970’s testified about his good qualities. Ministers and others who worked in the prison testified about his religious beliefs and activities, beneficial effect on other inmates, and good character. One witness testified he was a leader among death row inmates and was good with children visiting death row. He “loves kids and they were attracted to him.” Another testified that defendant is “a peaceful person and he creates peace” and “a spirit of joy.” His execution would “devastate” them.
 

 II. Discussion
 

 A.
 
 Dismissing a Prospective Juror for Cause
 

 Defendant contends the trial court erred in excusing one prospective juror for cause. “A prospective juror may be excused for cause if that juror’s views on the death penalty ‘would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” ’ [Citations.] ... On review, if the juror’s statements are equivocal or conflicting, the trial court’s determination of the juror’s state of mind is binding. If there is no inconsistency, we will uphold the court’s ruling if it is supported by substantial evidence.”
 
 (People v. Carpenter
 
 (1997) 15 Cal.4th 312, 357 [63 Cal.Rptr.2d 1, 935 P.2d 708].)
 

 The statements of the prospective juror in question were both conflicting and equivocal. In a juror questionnaire, he made several equivocal responses, but he also stated, “I will not vote to put any one to death.” During voir dire, when asked about this statement, he said, “I’m trying to get out of it. No, I mean I would do the right thing if I was put on a jury. I would do what the law says and . . . there’s just so much a parameter you are going with.” He made a number of other equivocal and contradictory responses, but ultimately responded, “It would be hard,” when asked whether he “could ever personally cast your vote to put him to death.” The prosecutor challenged the juror for cause. The court had “a lot of mixed feelings about him.” It could not “tell. . . whether he’s lying and whether he isn’t, really.” It granted the motion: “It’s just that this man is too far out. Maybe your [defense counsel’s]-description is correct, he’s a kind of a philosophical [H]amlet. But whatever it is he’s not a reliable one.”
 

 
 *234
 
 Because the prospective juror’s statements were equivocal and conflicting, we defer to the trial court’s determination. We find no error.
 

 B.
 
 Exclusion of Evidence of Prostitution
 

 In
 
 Phillips I,
 
 defendant argued the court had erred in excluding evidence that Colman was a prostitute and had gone to Fresno at the time of the crimes to engage in prostitution. We disagreed, finding the court had discretion to exclude the evidence under Evidence Code section 352.
 
 (Phillips I, supra,
 
 41 Cal.3d at pp. 49-51.) At retrial, defendant again sought to present this evidence and argued new theories why it was admissible. The court again exercised its discretion to exclude the evidence, first before Colman testified, then again when defendant argued that her actual testimony made the evidence more probative. As before, defendant contends the court erred in excluding the evidence.
 

 What we said in
 
 Phillips I
 
 remains true. “Permitting the defense to elicit testimony from Colman that she engaged in acts of prostitution had an obvious potential for embarrassing or unfairly discrediting her. (Evid. Code, § 765.) The degrading impact of such questions has long been recognized. (See
 
 People
 
 v.
 
 Crandall
 
 (1899) 125 Cal. 129, 134 [57 P. 785].) The question faced by the trial court, then, in deciding on the motion
 
 in limine,
 
 was whether the patent prejudicial impact of permitting such questioning was substantially outweighed by its probative value. (Evid. Code, § 352.)”
 
 (Phillips I, supra,
 
 41 Cal.3d at pp. 49-50.)
 

 Defendant argues that differing circumstances and the different theories he proffered at the retrial compelled the court to admit the evidence. We disagree. Prostitution activities might have some slight relevance to a witness’s credibility, but we made clear in
 
 Phillips I
 
 that the court had discretion to exclude the evidence. That Colman was with defendant in Fresno was obviously highly relevant, but her occupation or the reason she was in Fresno was at most marginally relevant. Defendant argues the evidence was relevant to whether he had attempted to establish an alibi. The trial court considered these arguments at trial. It carefully exercised its discretion, both at the outset of trial and when defendant raised the issue again during Colman’s actual testimony. At the second trial as well as the first, the court acted within its discretion in finding that the highly prejudicial nature of this evidence outweighed any probative value.
 

 C.
 
 Exclusion of Defense Hearsay Evidence
 

 Tamara Nichols testified for the defense. She was Richard Graybill’s girlfriend in late 1977 and was also acquainted with Colman and defendant,
 
 *235
 
 whom she knew as “Speed.” Defendant sought to have her testify about a statement Graybill, who had died by the time of the retrial, made to her regarding the shooting. The prosecutor objected on hearsay grounds. As an offer of proof, Nichols testified outside the presence of the jury that Graybill left her home around 7:00 p.m. on December 7, 1977, saying “he had some business to take care of.” He returned around 2:00 a.m. the next morning, “nervous,” “very excited,” and “white as a sheet.” Speaking “very rapidly,” Graybill made the following statement that defendant sought to introduce: “[A] business deal had gone sour. And that there was a shoot-out and that Speed was shooting everything in sight.” On cross-examination, Nichols testified that Graybill and defendant were in frequent contact by telephone and in person during that time period.
 

 Defendant argued the statement was admissible as a spontaneous declaration. The prosecutor responded that there was no indication Graybill was describing what he had personally observed instead of merely repeating what someone else, possibly defendant, had told him. After taking the matter under submission, the court excluded the evidence. It expressed doubt the statement was spontaneous, but based its ruling mainly on the absence of an indication Graybill had personally perceived the events.
 

 Defendant contends the court erred in excluding the evidence. He argues, first, that the statement was admissible under the spontaneous statement exception to the hearsay rule. (Evid. Code, § 1240.) Evidence Code section 1240 provides: “Evidence of a statement is not made inadmissible by the hearsay rule if the statement:
 

 “(a) Purports to narrate, describe, or explain an act, condition, or event
 
 perceived by the
 
 declarant; and
 

 “(b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception.” (Italics added.)
 

 The italicized language makes clear that a hearsay statement, even if otherwise spontaneous, is admissible only if it relates to an event the declarant perceived personally. Otherwise, the statement would be hearsay on hearsay and admissible only if each layer of hearsay separately met the requirements of an exception to the hearsay rule.
 
 (People v. Arias
 
 (1996) 13 Cal.4th 92, 149 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Defendant does not suggest that any statement from an unidentified other source to Graybill would itself qualify as an exception. Thus, assuming Graybill’s statement to Nichols was otherwise spontaneous, its admissibility turns on whether he was relating events he saw himself or repeating what he had heard from
 
 *236
 
 some other source. As this is a factual question, we will uphold the trial court’s determination if it is supported by substantial evidence.
 
 (People
 
 v.
 
 Jones
 
 (1984) 155 Cal.App.3d 653, 660 [202 Cal.Rptr. 289].) We review for abuse of discretion the ultimate decision whether to admit the evidence.
 
 (Ibid;
 
 see also
 
 People v. Raley
 
 (1992) 2 Cal.4th 870, 894 [8 Cal.Rptr.2d 678, 830 P.2d 712];
 
 People v. Poggi
 
 (1988) 45 Cal.3d 306, 318 [246 Cal.Rptr. 886, 753 P.2d 1082].)
 

 A similar question arose in
 
 Ungefug v. D'Ambrosia
 
 (1967) 250 Cal.App.2d 61 [58 Cal.Rptr. 223], which involved a fatal automobile accident. There, the trial court admitted as a spontaneous statement an ambulance driver’s testimony that he had heard someone say “the victim had been hit twice, once by another car that failed to stop.”
 
 (Id.
 
 at p. 64.) The Court of Appeal found the court erred. “It must . . . appear ‘in some way, at least, and with some degree of persuasive force’ that the declarant was a witness to the event to which his utterance relates. [Citation.] Although this does not require direct proof that the declarant actually witnessed the event and a persuasive inference that he did is sufficient, the fact that the declarant was a percipient witness should not be purely a matter of speculation or conjecture. [Citations.]”
 
 (Id.
 
 at p. 68.) The court found “the inference, if any, that the declarant actually witnessed the accident is not persuasive in the instant case,” partly because there was “no evidence that there were eyewitnesses to the accident or that there were others in the immediate vicinity of the scene of its occurrence.”
 
 (Ibid.)
 

 The court acted within its discretion in this case. Graybill’s statement to Nichols did not indicate he had personally observed the events. There was virtually “no evidence that there were eyewitnesses to the [crime] or that there were others in the immediate vicinity of the scene of its occurrence”
 
 (Ungefug v. D'Ambrosia, supra,
 
 250 Cal.App.2d at p. 68) other than the occupants of the two vehicles, i.e., other than Rose, Colman, and defendant. Rose and Colman both testified there was no third vehicle at the scene. The only contrary evidence was that several days after the crime, Rose nodded his head affirmatively when asked whether another vehicle was present. However, Rose was badly hurt and heavily sedated at the time and gave a number of incorrect responses. He testified that he “could have said •anything during those days.”
 

 Defendant argues that Nichols’s testimony supports the inference that Graybill was personally present during the shooting. She testified that, shortly before the shooting, Graybill left, telling her he had some “business to take care
 
 of”
 
 She also said that in November 1977, she overheard discussions involving Graybill “about some building supplies,” that he “was
 
 *237
 
 involved in girls, some prostitution that was going on,” and she heard some “mention about drugs.” She recalled some “mention of a couple of building contractors from the coast that they were going to supply some . . . building materials to.” It “seem[ed]” to her “it had to do with insulation,” although she was not sure. Graybill “mentioned” that defendant was involved and said “vaguely that there was a meeting set up and that they were going to supply the building materials at that meeting.” In light of the uncontradicted testimony of Colman and Rose that no third vehicle was at the scene, these comments did not compel the trial court to conclude that the “business” Graybill had the night of the crime was the transaction involving Bartulis or Rose (rather than, for example, prostitution or drugs) or to find a “persuasive inference”
 
 (Ungefug
 
 v.
 
 D'Ambrosia, supra,
 
 250 Cal.App.2d at p. 68) that Graybill had somehow witnessed the crime. Defendant also argues that Nichols’s testimony about Graybill’s demeanor shows the events greatly affected him, indicating that he personally observed them. However, even hearing of these events involving persons he knew could have affected Graybill greatly.
 

 The evidence supports the court’s finding that Graybill could have been repeating what he had heard from someone else such as defendant himself. Colman testified that defendant told her to state falsely that there had been a “shootout,” and that, after the crime, she and defendant stopped to wash blood from the windshield and to get gas. No one asked her at trial whether defendant made a telephone call during this stop. Moreover, as the Attorney General notes, it is hard to believe that an actual observer of the events would talk about the shooting without even mentioning the fire and the spectacle of a flaming Rose appearing to rise from the dead, only to be hit by defendant’s car. Because the court properly excluded the evidence, we need not decide whether the statement otherwise qualified under Evidence Code section 1240 as a spontaneous statement.
 

 Defendant argues the evidence was also admissible as a statement against Graybill’s penal interest under Evidence Code section 1230. The statement was against
 
 defendant’s
 
 penal interest, but not Graybill’s. Defendant argues it was against Graybill’s penal interest because “it put him at the scene of the shooting.” As discussed above, it put him at the scene only if he was relating what he saw rather than what someone told him. Moreover, mere presence at a crime scene is not a crime. The evidence was no more admissible under this exception than under the spontaneous statement exception.
 

 Defendant also argues that, even if the court properly excluded the statement under California law, its exclusion violated his rights to due process and to present mitigating evidence under the United States Constitution. (See
 
 Skipper v. South Carolina
 
 (1986) 476 U.S. 1, 4 [106 S.Ct. 1669,
 
 *238
 
 1670, 90 L.Ed.2d 1];
 
 Green
 
 v.
 
 Georgia
 
 (1979) 442 U.S. 95 [99 S.Ct. 2150, 60 L.Ed.2d 738].) We disagree. “[N]either this court nor the high court has suggested that the rule allowing all relevant mitigating evidence has abrogated the California Evidence Code.”
 
 (People v. Edwards
 
 (1991) 54 Cal.3d 787, 837 [1 Cal.Rptr.2d 696, 819 P.2d 436].) “As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused’s right to present a defense.”
 
 (People v. Hall
 
 (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].) Exclusion of hearsay testimony at a penalty phase may violate a defendant’s due process rights if the excluded testimony is highly relevant to an issue critical to punishment
 
 and
 
 substantial reasons exist to assume the evidence is reliable.
 
 (People
 
 v.
 
 Kaurish
 
 (1990) 52 Cal.3d 648, 704 [276 Cal.Rptr. 788, 802 P.2d 278].) Defendant contends the evidence was relevant to the critical issue whether the shooting of Rose and Bartulis was a premeditated killing or the end result of a shootout. However, absent some basis for concluding that Graybill related his personal observations, rather than repeated what someone else told him, no substantial reason exists to assume the statement is reliable. Its exclusion violated none of defendant’s constitutional rights.
 

 D.
 
 Issues Regarding Jury Instructions
 

 Defendant argues the court erred in refusing his request to instruct the jury that it could consider any lingering doubt about his guilt. We disagree. An instruction on lingering doubt was unnecessary in light of the other instructions.
 
 (People v. Hines
 
 (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388], and cases cited.) Defendant argues that this conclusion is inconsistent with the decision of
 
 Franklin
 
 v.
 
 Lynaugh
 
 (1988) 487 U.S. 164 [108 S.Ct. 2320, 101 L.Ed.2d 155], and that his right to have the jury consider lingering doubt is of little value without a specific instruction. The arguments lack merit.
 
 (People
 
 v.
 
 Johnson
 
 (1992) 3 Cal.4th 1183, 1252 [14 Cal.Rptr.2d 702, 842 P.2d 1].)
 

 Defendant also argues the court had a sua sponte duty to instruct the jury that “unanimity is not required for consideration of mitigating factors.” We rejected a similar contention in
 
 People v. Breaux
 
 (1991) 1 Cal.4th 281, 314-315 [3 Cal.Rptr.2d 81, 821 P.2d 585]. Although “a
 
 requirement
 
 of unanimity improperly limits consideration of mitigating evidence”
 
 (id.
 
 at p. 314), we held that the court did not have to give a specific instruction in light of the instructions it did give. The same is true here. The instructions neither limited the consideration of mitigating evidence nor suggested “that any particular number of jurors was required to find a mitigating circumstance. The only requirement of unanimity was for the verdict itself.”
 
 (Id.
 
 at p. 315.)
 

 
 *239
 
 Defendant argues that the actual instructions were unclear. The court instructed that “a juror” may consider evidence of other crimes in aggravation only if “a juror” is satisfied beyond a reasonable doubt that defendant committed them, and that “all jurors” need not agree on this point. It further instructed that “[i]f any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a factor in this case,” but not otherwise. In its concluding instructions, the court told the jury that it was “your duty” to determine which penalty to impose, that “you” shall determine the penalty, that “[y]ou” shall retire and select a foreperson, and that “to make a determination as to the penalty, all 12 jurors must agree.” Defendant argues that these instructions created a “substantial probability” the jurors would believe “that they unanimously must agree that a mitigation factor exists before a mitigation factor can be considered.” As a whole, however, the instructions were clear. The court also told the jury that the parties “are entitled to the individual opinion of each juror,” and that “[e]ach of you must decide the case for yourself. . . .” In light of this language, and the absence of a suggestion that all jurors had to agree on a mitigating factor before any could consider it, we find no reasonable likelihood the jury misconstrued the instructions as defendant contends.
 
 (People v. Clair
 
 (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].)
 

 E.
 
 Adequacy of the Appellate Record
 

 Defendant argues that the appellate record does not reflect an alleged hearing in which he appeared without counsel before Mariposa County Superior Court Judge Richard McMechan to make a confidential funds request under section 987.9.
 
 [2]
 
 Defendant claims Judge McMechan denied the funds request. After an evidentiary hearing, the trial court found the hearing never occurred. We conclude that substantial evidence supports the finding and that, accordingly, the appellate record is complete.
 

 1.
 
 Factual Background
 

 After we reversed the original penalty decision, the superior court granted a number of confidential funds requests that defendant, represented by counsel, made. Eventually, the court appointed Attorney Katherine Hart to represent defendant. In July 1989, the court allowed defendant to act as cocounsel. Between that date and the end of trial in late 1991, defendant made, and the court granted, several other confidential funds requests.
 

 The original certified appellate record included two essentially identical documents filed October 9, 1990, and December 21, 1990, in which defendant asked for an in camera hearing to request an unspecified amount of funds
 
 *240
 
 for an unspecified purpose. It also included an order filed December 21, 1990, setting a hearing for “January 4, 1990”
 
 (sic:
 
 obviously meaning 1991); and a minute order dated January 4, 1991, stating that the “hearing re 987 funds will be re-scheduled for a time when another judge can hear the matter.” The record contained nothing else regarding the matter; it did not even reflect whether the hearing was ever held.
 

 Defendant moved to augment the record to include the transcript of another hearing. He signed a declaration which stated the following. “About late January 1991, I personally appeared in Madera County Superior Court . . . before . . . Judge McMechan for a hearing upon my request for Penal Code section 987.9 funds.” Hart was not present at the hearing. “Judge McMechan was visibly upset and gave a strong speech” saying that he, defendant, should not have been allowed to proceed “as second counsel.” Defendant asked for $25,000 to “investigate, conduct experiments and build an exhibit” to show that the bullet that killed Bartulis could not have been fired from outside the vehicle. The court denied his request “in its entirety.”
 

 Eventually, a transcript of a hearing before Judge McMechan on January 30, 1991, was obtained, and we augmented the record to include that transcript. The transcript showed that both Hart and defendant were present at the hearing, and that Hart spoke for the defense. At the beginning of the hearing, Judge McMechan commented, “In this case you wouldn’t be co-counsel. There are no co-counsel cases before me today.” Judge McMechan
 
 granted
 
 the funds request for $6,500. Hart then stated “we” would make “further” funds requests in the future. Judge McMechan expressed a willingness to consider these requests. Later he granted three more funds requests without a hearing.
 

 After we filed this transcript, defendant filed a declaration in this court stating that he had appeared at the January 31, 1990, hearing with Hart. He noted the mention at the hearing of possible “further” funds requests and stated, “I subsequently prepared, filed and personally appeared, without co-counsel, to request the amount of $25,000.00 987.9 funds .... These funds were denied.” Later, he moved to augment the record to include a transcript of this alleged second hearing. Defendant declared that “the hearing probably occurred in February or March 1991” and certainly before August 1991. He claimed that the January 30, 1991, hearing related solely to his October 9, 1990, funds request, and that the second hearing related to his December 21, 1990, request. He said that Judge McMechan denied this second funds request, and that he, defendant, then “so informed attorney Hart by telephone.”
 

 We ordered the superior court to determine whether this alleged second hearing actually occurred. In response, Madera County Superior Court Judge
 
 *241
 
 Charles A. Wieland held an evidentiary hearing. Among the witnesses were Judge McMechan, a court reporter, Hart, defendant’s appellate counsel, and defendant himself. Judge McMechan remembered the hearing involving Hart but not a second hearing. He did not believe he presided over a hearing involving defendant without Hart, although he would “defer” to the record. He also testified that if defendant had “appeared before me to ask for money and he had co-counsel, or was represented, I would not have proceeded without his counsel present or his co-counsel present . . . .”
 

 Hart testified that, as “lead counsel [she] controlled the case,” but she “worked very closely with” defendant. “[H]ardly a day went by that I did not speak with [defendant] about the case and discuss the case with him.” She was the one who made the section 987.9 funds requests, although defendant would generally suggest to her areas of investigation that needed funding. She did not recall authorizing defendant to make a funds request without her. She did recall that defendant once told her he had appeared “at some type of hearing” without her. She had no “specific recollection that it was a funding request.” In an earlier declaration, she had said that defendant told her he had appeared without her “for some type of funding request,” but at the evidentiary hearing she could not recall the type of hearing. She testified that if defendant had “appeared without me at a hearing, I can’t imagine it would have been a hearing where the district attorney would have been present. So I believe it was some type of closed hearing. Therefore, it’s most likely it would have been a funding hearing.” Defendant testified that the second hearing before Judge McMechan did take place without Hart, and that he informed her that his funds request had been denied.
 

 After the hearing, Judge Wieland prepared and filed a detailed “Confidential Statement of Decision” concluding that the alleged second hearing never occurred. He noted that no significant evidence supported the claim other than defendant’s testimony. Judge McMechan had no memory of the hearing. Hart “denie[d] any knowledge of the need for such monies, the written request for funds, or the hearing itself. . . . One can only wonder why [defendant] would go it alone when requesting three to five times the monies previously requested, why his attorney has no knowledge of these matters despite their almost daily communication and regular sharing of draft pleadings, and why no record exists.” Judge Wieland noted that defendant claimed he filed the supporting documents for the request
 
 before
 
 the actual January 30, 1991, hearing, but no one mentioned that matter at that hearing. “[Coverall,” Judge Wieland found, “the evidence is compelling: no hearing was held before Judge McMechan at any time after January 30, 1991 in which [defendant] appeared without co-counsel asking for Penal Code section 987.9 funds . . . as he now alleges.”
 

 
 *242
 
 2.
 
 The Contentions
 

 Defendant challenges Judge Wieland’s finding that the second hearing did not occur. “[Settlement of the record is primarily a question of fact to be resolved by the trial court. [Citations.] Once settlement is ordered, the
 
 trial court
 
 has broad discretion to accept or reject counsel’s representations in accordance with its assessment of their credibility.”
 
 (People
 
 v.
 
 Clark
 
 (1993) 5 Cal.4th 950, 1011 [22 Cal.Rptr.2d 689, 857 P.2d 1099].) The rule that the trial court may assess counsel’s credibility obviously applies also to a defendant’s own credibility. The evidence supports Judge Wieland’s rejection of defendant’s belated claim that
 
 two
 
 hearings occurred before Judge McMechan. No document suggests the second hearing ever occurred; Judge McMechan did not recall it, even though a hearing with an unrepresented capital defendant would have been unusual; even Hart had no memory of it. It is inconceivable that defendant would have done what he said and attended the hearing as he describes without telling Hart or that she, whose funds requests were always granted, would fail to remember a $25,000 request that had been denied. “Substantial evidence supports the trial court’s findings.”
 
 (Ibid.)
 

 Arguing to the contrary, defendant cites Hart’s testimony for support. Her testimony, however, supports the
 
 court’s
 
 finding. She said that defendant told her he had attended a hearing in her absence, but she did not recall whether it involved a funds request. She said she believed the hearing did involve a funds request because she did not think defendant would appear in court with the district attorney present. However, as Judge Wieland noted, defendant
 
 did
 
 appear in court without Hart at least once in 1991—at a trial setting conference with the district attorney present. This hearing could be the one that defendant mentioned.
 

 Defendant also notes that his early declarations stated that Judge Mc-Mechan had expressed strong views against allowing him to proceed as cocounsel. At the evidentiary hearing, Judge McMechan testified that it would not be his “policy to proceed with a section 987.9 funds application where counsel was involved regardless of the defendant’s status.” Defendant claims the “only possible way” he could have known of these views is if he had actually been present at the alleged hearing. However, as Judge Wieland noted, “[t]he transcript of the January 30, 1991 hearing [at which defendant was present] contains a court statement that may be interpreted along those lines. That is the most likely source of that statement.” Defendant asserts that the “mild discussion of the law regarding co-counsel status of criminal defendants which occurred at the 30 January 1991 hearing simply is not comparable to the extremely strong statement which [he] attributes to Judge
 
 *243
 
 McMechan at the hearing.” To the extent this statement is correct, it does not aid defendant’s credibility. Judge McMechan’s testimony at the evidentiary hearing was equally mild. Only
 
 defendant
 
 attributes strong language to Judge McMechan.
 

 Defendant makes other arguments regarding the evidence but presents no reason to overturn Judge Wieland’s carefully considered finding.
 

 In a separate argument, defendant asserts that Judge McMechan abused his discretion in denying the funds request at the second hearing. However, Judge Wieland found that the second hearing never occurred. Moreover, even if we were to hypothesize that the second hearing did occur but left no trace in the record or the memory of anyone but defendant, Judge Mc-Mechan testified that he would not have proceeded without cocounsel’s presence. Such a ruling would have been well within the court’s discretion. Attorney Hart made several funds requests, as had previous counsel. All were granted. A court certainly could refuse additionally to grant a large sum of money to a defendant acting as cocounsel without lead counsel’s presence. Defendant was entitled to reasonable funds to investigate his defense, but he was not entitled to two parallel grants of public financing, one supervised by lead counsel and one obtained without lead counsel’s knowledge or participation.
 
 [3]
 

 Defendant makes an additional related argument. After Judge Wieland filed his decision, defendant moved to augment or settle the record again to include a “confidential declaration of [defendant] in support of his request for supplemental section 987.9 funds filed on 21 December 1990.” He testified at the evidentiary hearing that he had filed such a document, although he was not sure whether it related to the October 9,1990, request or the December 21, 1990, request. Judge Wieland found that this alleged declaration did not exist. We denied the application. Defendant contends this denial was erroneous.
 

 The two funds requests were identical, as were the accompanying points and authorities. The documents were generic and stated neither the amount sought nor the reason. Defendant claimed for the first time at the evidentiary hearing that he also filed a supporting declaration as to one of the requests. This claim is no more credible than his claim of a second hearing before Judge McMechan. At one time, the appellate record regarding funds requests was incomplete, which was why we ordered the proceedings culminating in
 
 *244
 
 the evidentiary hearing. Having reviewed the record of these proceedings, including Judge Wieland’s thorough and convincing statement of decision, we are now confident the record is complete. The alleged second hearing never occurred, and Judge McMechan did not deny a funds request. Indeed, all of defendant’s funds requests were granted. “Defendant is entitled to an appellate record that accurately reflects what was done and said in the trial court—not what he wishes had been done or said.”
 
 (People
 
 v.
 
 Tuilaepa
 
 (1992) 4 Cal.4th 569, 585 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)
 

 F.
 
 Cumulative Error
 

 Defendant argues that the cumulative effect of the alleged errors was prejudicial. There was, however, no error to cumulate.
 

 III. Conclusion
 

 The judgment is affirmed.
 

 George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.
 

 Appellant’s petition for a rehearing was denied March 29, 2000.
 

 [1]
 

 All further statutory references are to the Penal Code unless otherwise indicated.
 

 [2]
 

 Section 987.9 provides a procedure for capital defendants to make confidential requests for funds for investigation expenses.
 

 [3]
 

 We have cautioned that “[allowing a represented defendant to share legal functions with the attorney is generally undesirable.”
 
 (People v. Frierson
 
 (1991) 53 Cal.3d 730, 741 [280 Cal.Rptr. 440, 808 P.2d 1197].) This case illustrates the undesirability of the arrangement.