Filed 6/17/13  P. v. Illingworth CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOHN ILLINGWORTH,<br><br>Defendant and Appellant. | B240464<br><br>(Los Angeles County<br>Super. Ct. No. KA095815) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mike Camacho, Judge.  Affirmed.

Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael R. Johnsen and Jonathan M. Krauss, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

At trial, the jury found John Illingworth guilty as charged on one count of inflicting corporal injury on his child's parent, and the trial court found true a prior conviction allegation. Illingworth was then sentenced to state prison for a term of four years. He appeals, claiming the trial court committed misconduct in questioning witnesses and abused its discretion in admitting evidence of 9-1-1 calls. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

Viviana Doe (a fictitious last name to protect her privacy) and John Illingworth had dated since 2008, but their relationship was "on again, off again," with periods of argument and separation. In 2008, they had an "altercation" when Illingworth "got mad with [Doe]," and the police responded. At that time (on September 27, 2008), Doe wrote a letter for the police about what had happened. She said she had been walking past Illingworth's house on her way to a female friend's house when Illingworth stopped her and was "pushy and violent." He "acted like he was going to give her a kiss" but "then he head-butted [her]," giving her a "bump" on her lip. After that, they "talked things out and it was fine then."

On another occasion, in April 2009, when Doe was seven months pregnant with her first child with Illingworth, Illingworth "got upset when [Doe] was trying to leave" to go home. She wrote a letter for the police (dated April 24, 2009) that time as well. As recounted in the letter, he took the bicycle she had ridden to his house that day and threw it into the street. Then he slapped her in the face, "hit[ting her] with his open hand as hard as he could." He threw her bicycle into the street several times until he broke it, and Doe called the police to "come help" her. The slap left a "big mark" on Doe's face—his "handprint." That time, Illingworth went to jail for a few months.

About a month and a half or so after Illingworth got out of jail, Doe and Illingworth again "talked things out," and she "didn't think anything was going to happen" so they got back together.

On September 25, 2011, at 10:29 p.m., an unidentified female called 9-1-1, stating a "lady . . . she's yelling out for help. It's domestic violence." The caller provided the

2

location and said "she's running down the street, she was calling out for help, and that guy took off. . . . He was beating her up pretty bad. Oh, he's right here. That's him." She said the man and woman were Hispanic, described the woman's clothing and gave an approximate age for the woman; she said she was going to get the license plate of the man and reported back with such information, then stated "he just took off right now."

A second unidentified female called 9-1-1 at 10:30 p.m. and reported "a female screaming for help. A male, I think, is hitting her."

A third call regarding the same location came into the 9-1-1 operator at 10:31 p.m. Another unidentified caller said: "I have to report . . . a fight between a couple." She said the man had run down the street and was at the park "right now" at a truck, then said he had gone.

At 10:34 p.m., Doe called 9-1-1 and said, "Will you hurry up and send somebody over here now?" She provided her address and told the dispatcher: "He beat me up right now." She gave her name and said, "I want him to go to jail." The dispatcher told Doe she needed to "calm down." She responded, "No. But you better fuckin['] get him." She provided Illingworth's full name, said he was her "baby's dad," and told the dispatcher he had left in a blue GMC Colorado. "And you better fuckin['] come get him. . . . You should see how he left me. . . . I need paramedics right now."

Doe called 9-1-1 again at 10:37 p.m. and said, "I need someone here now." When the dispatcher asked where Illingworth went, she did not know but said he had probably gone home and provided his address. Again, she said, "I need you to come over here and get him," adding "he has priors for this shit."

At about 10:30 p.m. that night, El Monte Police Department Officer Aaron Armstrong was dispatched to Doe's apartment. When he met with Doe, she was "badly beaten about her face, was bleeding, swollen." Armstrong's partner photographed Doe. She was "hysterical, screaming. It took a while to calm her down." She was "panicked, screaming for help, begging us to go find the person who had beat her." She said his name was John Illingworth.

Doe told Officer Armstrong she had been dating Illingworth for about three years. She said they had been walking together toward her residence when they became engaged in a verbal argument. She said he "ended up getting upset, violently pushing her to the ground and standing over her and punching her five to seven times in the face while she screamed for help and tried to defend herself." Although she told Illingworth she had not done so, she said the argument was about whether she had been "hanging out with . . . El Monte gang members." After Illingworth stopped punching her, Doe said, he "got off of her and he ran away . . . ." She said he had gone back to her house and her mom had let him in because she did not know what had happened; he got some of his things and left. After that, she said, she went up to her apartment and called 9-1-1. She told Officer Armstrong there had been another incident the year before. She described Illingworth's truck and Officer Armstrong verified the license plate which matched the plate relayed by one of the 9-1-1 callers. Doe was "adamant" that she wanted Illingworth prosecuted.

Officer Armstrong then tried without success to locate Illingworth, checking the residence where he lived with his father (but finding the truck he had been driving was gone) and calling him on his cell phone (but he did not answer).

Detective David Rios was assigned to conduct the follow-up investigation and contacted Doe on October 6 by telephone. Doe confirmed the information she had provided Officer Armstrong, reiterating Illingworth had punched her in the face following an argument and then ran to her apartment, grabbed his backpack and left before she arrived there herself. She never stated that anyone else was the "real perpetrator."

Detective Rios left a message for Doe's mother (Guadalupe Alvarez), requesting that she call him, and she did. Alvarez told the detective she had been home when Illingworth was there, visiting his child.[1] Doe and Illingworth stepped out to take out the

_____

[1]    Detective Rios is fluent in Spanish (his first language), and he had no difficulty communicating with Alvarez.

4

trash, but it became evident to her they had gone someplace as they did not return right away. While she was home with her granddaughter, the "front door suddenly burst open[;]" she said Illingworth ran in, grabbed his backpack and left. A little while later, Doe "ran in the house. She was screaming. She had blood on her face and said that [Illingworth] had hit her . . . ."

When Detective Rios contacted Illingworth, he said he and Doe "had a verbal argument" and "nothing else happened."

Illingworth was charged with one count of inflicting corporal injury on a child's parent in violation of Penal Code section 273.5, subdivision (a).[2] Pursuant to subdivision (e)(2) of section 273.5, it was further alleged Illingworth had a prior conviction for violating section 243, subdivision (e)(1).[3]

At trial, the People presented evidence of the facts summarized above. Recordings of the 9-1-1 calls, including Doe's, were played for the jury. By then, Doe was pregnant with a second child with Illingworth. She testified that on September 25, 2011, she and Illingworth had been together from noon until 6:00 or 7:00 p.m. After dinner, they walked to her cousin's home. She said they were "trying to work things out," trying to see if they were "going to take it to the next level" which meant "getting [their] own place." They spent an hour at the cousin's home before returning to Doe's apartment. At about 8:00 p.m., Doe testified, Illingworth went home because he had to work the next day; Doe went across the street to the park.

While sitting on a park bench, Doe testified, she saw a black Nissan Sentra drive by. She had seen the man driving the Sentra before and he had tried to talk to her before, but she had ignored him. This time, she said, he stopped and tried to get her "to go back

---

[2] All undesignated statutory references are to the Penal Code.

[3] A second count for disobeying a domestic relations court order (§ 273.6, subd. (a)) was dismissed before trial. (§ 1385.)

to his room." She said she made a "smart remark."[4]  She started to walk away, but the man pushed her.  Then she knew there were two females.  She testified she saw one girl from the back, then said she felt one from the back because she pulled Doe's hair.  "All I remember is being dropped to the floor."  She could not see their faces.

The man was standing about 11 feet, 10 inches away, "just kind of looking around[;]" then she said she did not know where he was standing but knew he was standing nearby because his car was parked.  Doe was trying to swing but she was on the ground, and the "girls were all on top of her."  She said they hit her about 20 times with their fists.  She had a "hole on [her] lip" where her tooth went through it and "all this blood coming down all over."  Then, she testified, without saying anything, the "girls took off."  Also, the man was already in the car and he "was taking off."  The girls and the man went in the same direction, separately.

After the girls "went off on their own," and the man drove away, Doe testified, she ran across the street to her apartment and told her mother to call 9-1-1 because she just "got in a fight" with Illingworth.  Although she and Illingworth had "gotten along" that day, she said, she named Illingworth as her attacker because she was "afraid for [her] life" because she did not want to bring attention to the park because she assumed the attackers were nearby so she did not want anything to happen to her mother or her daughter "because they seen where [Doe] went."

When police arrived, she again said Illingworth had beaten her up but said she tried to call police several times later to "follow up" but the "detective never called [her] back."  She said she had lied to the police when she told them that  Illingworth had gotten angry with her for "hanging out" with gang members; that he grabbed her and pushed her to the ground; that he punched her five to seven times in the face; and that he had been drinking that night.

---

4       She first testified she had told the man, "No . . .  I don't go with people that I don't know."  Then she said she told him she was "not too hard up for drugs."

After the incident, before Illingworth was arrested, Doe and Illingworth continued to see each other. Illingworth had a new job, and Doe's mother moved out of the apartment. Doe was unemployed and Illingworth supported her.

After she calmed down, Doe was "immediately" aware Illingworth would be arrested because she had said he had been the one to attack her. By September 26, 2011 (the day after the incident), she knew she had "messed up" and "wanted to fix the situation" so she "asked" Illingworth to "call his lawyer to see what he suggested we do." She did not "fix the situation" when she spoke with Detective Rios on October 6, 2011.

Alvarez (Doe's mother) testified she was home when Doe came home "all beaten up." She said she did not know if Doe had left with anyone else when she took out the trash. First, she said Illingworth had not been to the apartment that day but then said he had been there for a few hours. When Doe came in beaten up, Alvarez said she asked Doe what had happened but Doe did not say who had attacked her. She said she did not speak with the police when they came because she was praying. She initially testified she had not spoken with police about what had happened, but then admitted telling Detective Rios Doe and Illingworth had left to take out the trash and were gone longer than expected. She denied saying Illingworth later burst into the apartment, grabbed his backpack and left again.

Alvarez said Doe was unemployed and she (Alvarez) was supporting Doe and her daughter, with another baby due. "The only thing I want is for him to be out. For me, he is a good person because she needs him. I'm helping to pay the rent. I have to pay my rent. So then she needs his help, please. I want, please, for him to be out."

In Illingworth's defense, his brother and his father testified he had been home at the time of the incident; they remembered the date because Illingworth was going to start a new job the next day.

The jury found Illingworth guilty as charged of inflicting injury on a fellow parent resulting in a traumatic condition in violation of section 273.5, subdivision (a). In a bifurcated proceeding, the trial court then found true the prior conviction allegation.

7

The trial court sentenced Illingworth to the upper term of four years in state prison.

He appeals.

## *DISCUSSION*

**Illingworth Has Failed to Demonstrate Prejudicial Judicial Misconduct.**

According to Illingworth, reversal is required because the trial court "aligned itself with the prosecution when it asked repeated and sometimes hostile questions of witnesses, implied Doe was deliberately misleading the jury and suggested [Illingworth's brother] may not have been truthful." We disagree.

Before the presentation of any evidence, the trial court instructed the jury: "Do not take anything I say or do during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." Later, the trial court instructed the jury with CALCRIM No. 3550, which again reiterated: "It is not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be."

During Doe's testimony, the prosecutor asked Doe if she had told the truth in the first letter she had written to police (when she said Illingworth had struck her in 2008).

"[Doe]: Um, yeah. That was—that was prior to—well, they had already went to his house. They had stopped me because the cops came and everything. They were circling. I guess somebody had called the cops.

"The Court: Viviana, I know you're doing your best to answer our questions. You need to focus on the questions asked, simply answer the question without elaborating—

"[Doe]: Okay.

"The Court: As you've been doing. The question is when you wrote that letter, was it a truthful statement?

"[Doe]: Yes.

"The Court: Next question."

8

Illingworth says the prosecutor intervened in this manner during Doe's testimony 24 times and interrupted Javier's testimony 7 times.  We have reviewed the record, and the bulk of Illingworth's objections on appeal to the trial court's intervention are of a similar nature.  He says the "most egregious comment" was when the court interjected during Doe's testimony as follows (and ultimately struck this portion of testimony): "You told us they left and then you went to your house.  Now you're telling us that they saw where you went afterwards.  I don't want you to mislead the jury . . . ."          "A court may control the mode of questioning of a witness and comment on the evidence and credibility of witnesses as necessary for the proper determination of the case.  [Citations.] *Within reasonable limits, the court has a duty to see that justice is done and to bring out facts relevant to the jury's determination*.  [Citation.]  *A court commits misconduct if it persistently makes discourteous and disparaging remarks so as to discredit the defense or create the impression it is allying itself with the prosecution.*  [Citations.]"  (*People v. Santana* (2000) 80 Cal.App.4th 1194, 1206-1207, original italics.)

"As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial."  (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237, citations omitted; see also *People v. Raviart* (2001) 93 Cal.App.4th 258, 269 ["'It is settled that a judge's examination of a witness may not be assigned as error on appeal where no objection was made when the questioning occurred'"].)  "However, a defendant's failure to object does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such misconduct, or when objecting would be futile."  (*People v. Sturm, supra,* 37 Cal.4th at p. 1237, citations omitted [hostility between trial judge and defense counsel was "evident"].)

Here, however, Illingworth never objected to the trial court's interactions with any of the witnesses. Consequently, he has forfeited this claim of error.  (*People v. Sturm, supra,* 37 Cal.4th at p. 1237; *People v. Raviart, supra,* 93 Cal.App.4th at p. 269.)  Although he cites *People v. Sturm, supra,* 37 Cal.4th 1218, for the proposition that a party need not object where such an objection would have been futile, he identifies no support in the record for his assertion an objection would have been futile in this case or

9

other indication a simple objection and admonition would not have cured any claim of prejudice. Having reviewed the record, we find no basis for Illingworth's unsubstantiated assertion of such futility. It follows that this claim of error was forfeited.

In any event (and noting his ineffective assistance of counsel claim), we find no merit in Illingworth's claim he was prejudiced as a result of judicial misconduct.

Even if the trial court's questioning highlighted conflicts and inconsistencies in Doe's testimony as Illingworth urges, any resulting error was necessarily harmless by any measure. (*People v. Sturm, supra,* 37 Cal.4th at p. 1244 [declining to decide whether *Chapman* or *Watson* standard applies to judicial misconduct for disparaging defense counsel and questioning witnesses in a manner indicating the court favored the prosecution].) Doe conceded that she had lied on a number of occasions. Indeed, she acknowledged she had lied in stating that the woman in court with her daughter was not her mother but her aunt (Celina Mendoza) and she did not know where her mother lived—testimony immediately proven false. She was shown to have lied to the police and to the court. Defense counsel specifically acknowledged in closing that she was neither honest nor trustworthy.

Furthermore, all of the contemporaneous evidence surrounding the attack established Illingworth had been the one who attacked Doe. She confirmed in her calls to the 9-1-1 operator that he had been the one to beat her, and the other calls were all consistent, with no mention of any other man with a Nissan Sentra or two girls who went off on their own. Indeed, the same license plate provided by one of the callers matched the truck Illingworth drove. In addition to her own 9-1-1 call, Doe confirmed what had happened to police later that night and again 11 days later. Alvarez identified Illingworth multiple times as well. At trial, it was clear that Doe was expecting another baby and was unemployed, her mother was under financial hardship doing the best she could to keep Doe "off the streets" and the two wanted Illingworth to help Doe. Because the evidence of Illingworth's guilt was overwhelming and the witnesses for the defense proved themselves to be unbelievable, Illingworth has failed to demonstrate prejudicial error as required for reversal. (*People v. Sturm, supra,* 37 Cal.4th at p. 1244.) It follows

10

that Illingworth's related claim of ineffective assistance for failure to object to the trial court's questioning of witnesses is also meritless.

In a related argument, Illingworth says he was deprived of a fair trial because the trial court impermissibly commented on the evidence and failed to instruct the jury with CALCRIM No. 3530 or its equivalent. As the Attorney General notes and Illingworth concedes in his reply, the trial court instructed the jury *twice* with the same language he says was missing from his trial—first, with CALCRIM No. 101, given before the presentation of any evidence, and later, with CALCRIM No. 3550, prior to deliberations. To the extent, Illingworth's challenge to the trial court's conduct survives this concession, we have rejected it in finding Illingworth was not prejudiced by judicial misconduct.

**The Trial Court Did Not Abuse Its Discretion in Admitting the 9-1-1 Calls Pursuant to Evidence Code Section 1240.**

Citing *People v. Gutierrez* (2000) 78 Cal.App.4th 170, 45 Cal.4th 789, 811, Illingworth says the "crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker," and there was no substantial evidence the callers were under the stress or excitement of the events they had witnessed. Therefore, the statements were inadmissible under Evidence Code section 1240, and he was prejudiced as a result.

Evidence Code section 1240 provides as follows: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

"(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and

"(b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

"The decision to admit evidence under Evidence Code section 1240 is reviewed for abuse of discretion. (*People v. Phillips* (2000) 22 Cal.4th 226, 236 [92 Cal. Rptr. 2d 58, 991 P.2d 145].) 'Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.] The

11

determination of the question is vested in the court, not the jury. [Citation.] In performing this task, the court "necessarily [exercises] some element of discretion . . . ." [Citation.]'" (*People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1588-1589.)

As our Supreme Court explained in *People v. Gutierrez, supra,* 45 Cal.4th 789, "The word 'spontaneous' as used in Evidence Code section 1240 means 'actions undertaken without deliberation or reflection. . . . [T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." (*Id.* at p. 811, citation omitted.) In this case, having reviewed the statements in their entirety, the record supports the conclusion the statements were made contemporaneously, spontaneously, and without time for deliberation. (*Ibid.* ["whether the speaker blurted it out, for example" may be important as an indicator of the mental state of the declarant].) We conclude the trial court did not abuse its discretion in admitting these statements as spontaneous statements within the meaning of Evidence Code section 1240. (*People v. Saracoglu, supra,* 152 Cal.App.4th at p. 1588.) Moreover, Doe herself called 9-1-1 within minutes of the other callers, relaying the same information which she also confirmed with police that night and again weeks later (as did Alvarez). Even if Illingworth had established error in the admission of the other 9-1-1 statements, he has failed to demonstrate how he was prejudiced as a result on this record.

Because we have rejected each of Illingworth's other claims, it follows that his claim of cumulative error fails as well.

## DISPOSITION

The judgment is affirmed.


WOODS, J.

**We concur:**


**PERLUSS, P. J.**                    **ZELON, J.**

12