Filed 3/1/21  P. v. Taylor CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C084192 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 14F07333, 14F04780) |
| v. | |
| ARTHUR BEN TAYLOR, JR., | |
| Defendant and Appellant. | |

A jury found defendant Arthur Taylor guilty of counts including corporal injury to a cohabitant and attempted murder.  He was sentenced to an aggregate term of 59 years to life.

On appeal, he raises nine contentions:  (1) the trial court erred in admitting evidence of his prior act of domestic violence from 1992; (2) the court erred in refusing to admit evidence of the victim's character for violence; (3) the court erred in admitting a 911 call purporting to describe an attack on the victim; (4) insufficient evidence established defendant acted with intent to kill; (5) the court erred in refusing to instruct

1

the jury on the definition of "abuse"; (6) the errors cumulatively require reversal; (7) the court erred in allowing the prosecution to prove the nature of one of defendant's three prior strike convictions through a preliminary hearing transcript; and (8) remand is necessary for the trial court to reconsider defendant's motion to strike his prior strikes. Finally, in a supplemental brief he (9) challenges the imposition of certain fines and fees under *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1172 (*Dueñas*).

We agree as to defendant's seventh contention. We will strike the prior strike and remand to allow the prosecution to prove the nature of that conviction through proper evidence if it chooses to do so. We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant's convictions arose from two attacks, three months apart, on the same victim. The victim was defendant's then girlfriend. In the first attack, defendant hit her in the head with a crowbar. In the second attack, he stabbed her approximately 12 times. Both the victim and defendant testified at trial.

### The Prosecution Evidence

**The Crowbar Attack**

The victim testified that she had been dating defendant for about two years, and they lived together. She described him as "a jealous guy."

The night of the crowbar attack, she and defendant were at a party at her cousin's house. The victim had drunk enough at the party to feel the effects of it. At some point, defendant wanted to leave, but she did not want to. An argument ensued, and defendant left the party.

The victim later got a ride home with her cousin and another woman. They planned for the victim to get her wallet before going to a liquor store. When they arrived at the victim's home, defendant's SUV was parked nearby. The victim went inside, while the cousin and the other woman stayed in the car. Defendant was inside. She

2

retrieved her wallet but as she was leaving, defendant took it from her. When she asked for it back, he refused.

They started fighting. Outside, the victim told her cousin defendant wouldn't give her the wallet. The victim and her companions chased defendant down the street, to his car. As the victim described, defendant went, "buck wild" and took a "crowbar"[1] from inside his SUV.

When the victim saw the crowbar, she and the other two women started running. The victim then felt something on the back of her head. She testified, "[l]ots of blood just started gushing out, so I ran back towards the family and had them call 911 for me."

Defendant got in his SUV and drove off.

**The Stabbing**

Three months later, defendant and the victim were still living together. Late one night, the victim was at a party and drank "a lot."

Defendant drove the victim home. At home, in the garage, she told him she no longer wanted to be with him. Defendant got upset and tried to push her into the trunk of his car.

She fought him off and ran to the kitchen. He followed and started pulling knives from the drawer. As the victim testified, defendant grabbed a big knife, looked at it, then put it back. He then grabbed a different knife and started stabbing her. As best the victim could recall, she raised her hands to protect herself, and defendant stabbed her hands. The victim testified that "I was trying to get [the knives] out of his hands when he had them. Once he got the knives, I didn't fight back anymore."

At one point, she slipped on her own blood and fell. Defendant went through the knives drawer again and found a different knife. He then continued to stab the victim,

---

[1] The object was variously described at trial as a "crowbar," "jack hammer," and "tire iron."

3

stabbing her neck, arms, side, back, and legs. She estimated he stabbed her about 12 times.[2] During the stabbing she told defendant she had her kids to live for and didn't want to die. She also yelled for help.

The victim saw bright lights from responding police officers. At some point, defendant stopped stabbing her and ran out the back door. The victim stayed on the floor until police arrived. She estimated the attack took four to five minutes.

After the attack, the victim was hospitalized for at least a week. Part of her treatment involved exploratory surgery to ensure her intestines and internal organs were okay. The jury was shown photos of her injures.

**The Victim's Interview at the Hospital**

A detective spoke with the victim in the hospital. She reported that before the stabbing defendant had accused her of cheating. He also said something to the effect of, " 'I'm never going to let you go' " and that he wanted to kill her.

**The 2013 Uncharged Incident**

The victim also testified to an uncharged incident occurring six months before the crowbar attack. Defendant, jealous of victim spending time with her family, grabbed the victim's hair and dragged her down the hallway. In the process, he pulled out some of her braids. He also bit her finger.

The victim subsequently told the district attorney to drop the charges.

**The Defense Evidence**

**Defendant's Testimony About the Crowbar Attack**

Defendant testified, that before the crowbar incident, the victim was drunk at a party and he was ready to leave, so he went home.

---

[2] An officer who spoke to the victim after the stabbing counted 20 injures on the victim's body.

About one-half hour or so later, the victim arrived with several other people. The victim came in the house and took a small coin purse from her purse. Defendant snatched the coin purse and looked in it. He was dismayed to find only $70 inside as he had given her $170 for food the day before. The victim said she had spent the money. Defendant responded by putting the coin purse in his pocket. He then took his dog by the leash and walked outside.

As he walked to his SUV, he passed a woman who had arrived with the victim; she was smoking a cigarette. Defendant was opening the hatchback of his SUV to let his dog in when he saw that the woman with the cigarette had followed him. The women then "stumped" her lit cigarette, flicking it in his face and hitting him close to his eye.[3]

Defendant then took what he described as a "little jackhammer thing" from his SUV. As he did, the woman with the cigarette ran off. He chased after her. When he turned down a street, he saw a person walking with his back to him. He threw the jackhammer, thinking it was the woman who had flicked the cigarette. He then went back to his truck.

During the testimony, the trial court attempted to clarify: "So you threw the metal object intentionally but it hit a person different from the person you expected it to hit; is that right?" Defendant answered, "Yes sir." He also said "Yes," when the court asked, "So [you] defend yourself while someone was running away from you?"

**Defendant's Testimony About the Stabbing**

Defendant testified the victim was drunk. Not wanting to be around her, he packed his things to go to his sister's. As he was collecting his things in the garage, the victim grew suspicious that he was tampering with her car.

---

[3] The victim testified that she had no memory of her cousin flicking a lit cigarette in defendant's face.

When he went back into the kitchen, the victim pointed an 8-inch steak knife at him. He grabbed her hand, took the knife, and tossed it in the recycling box in the garage. He then went back to gather his possessions.

When he returned to the kitchen, the victim was holding a butcher knife. When he asked what she was going to do with it, she came after him with it. He grabbed her, and they fell on the floor and "wiggled around a little bit on the floor with the knife . . . ." He testified that they had slipped on urine and water from a bath towel that was on the floor.

While on the ground, he tried to hold the victim, to stop her from sticking him with the knife. At one point he managed to get off the ground, but the victim still held the knife. Standing over her, he struggled to pry the knife from her. At this point, he did not notice whether either of them had been cut.

Defendant testified that after he managed to pry the knife from the victim, she stood up and, trying to fight him, continued to run towards him. He responded by making jabbing motions with the knife, intent on keeping her from the knife drawer.

Asked if he actually jabbed or poked the victim with the knife, defendant testified, "I would say maybe just poke, you know, when she kept trying to get over there . . . ." Asked, "[s]o every time she would try to get to the knives, you would poke her with the knife?," he said: "No. She would get poked because she kept running towards me trying to fight with me."[4]

At one point defendant was asked how the victim got stabbed in the back. He explained: "She got stabbed on her back because every time she would come to my side, I would try to run around her. Then she — then when I would run around her, she kept

---

[4] The court attempted to clarify: "Are you saying she ran into the knife or you poked her with the knife?" Defendant responded, "I was doing like this (indicating) every time she was running trying to hit me. I kept doing like that and she just kept coming."

coming. So when I run around her, I just stick her like that (indicating) so she would stop."**5**

Defendant testified that the victim continued to run at him for 10 to 15 minutes before he saw police flashlights coming through the garage. He then closed the kitchen door and left through the backyard.

He denied that there had been any screaming or yelling in the kitchen. Rather, screaming had come from a house next door. He also testified that when he left the house, the victim was standing.

Defendant went to a neighbor's house, telling him he had "got into it" with the victim, he had smacked her, and needed a place to stay because the police were there. Thereafter, he drove to his daughter's house in Temecula.

### The Prosecution Rebuttal Evidence

On rebuttal, the prosecution called a detective who spoke to defendant shortly after he was arrested. Of the victim, defendant said he was upset at their lack of intimacy and that Facebook was getting more attention than he was. He also thought she was being unfaithful.

As to the stabbing, defendant said the incident started when she told him not to touch her when he tried to touch her bottom. She also told him he couldn't sleep in her bed. He then walked into the kitchen, and she followed. All hell broke loose when he bumped her, spilling her drink. According to defendant, she then grabbed a steak knife.

Defendant told the detective he easily took the knife from her. The victim then produced a big knife. Defendant said: "Oh. You're going to stick somebody?" He told

---

**5** As to the stab wound just above the victim's buttocks, defendant said, "That's when she had the big knife and she kept spinning around and I was grabbing at her hands like this here (indicating). And when she would spin — . . . [¶] When she was spinning around, she had a big knife and when I grabbed her, she kept spinning with the knife in her hand."

7

the detective he struck her with the knife because she was going to stick him with the knife. He said: "How you like being stuck?" He said, she started talking crazy and fighting at him.

Defendant was able to take both knives from the victim. Asked why he didn't stop once he had the knife, he said "Maybe at that point — I don't know." He then went on to say, that he "flashed on Facebook," he mentioned how she had told him not to touch her, and how she was torturing him on Facebook. He said the victim had an attitude every time she was on Facebook.

Defendant also said he was frustrated, upset, and felt he had been treated badly. The detective testified that defendant had explained that "[h]e felt bad for what he had done but that he doesn't understand why, just that he was upset about it — about his treatment." The detective testified, "He was specifically stating that people have used him and he felt like he was getting used a lot of the times. That he did a lot of stuff around the house; that he cleaned the house. He picked things up. He helped with money, et cetera, and he was upset about that." When the detective was asked if that was why defendant stabbed the victim, the detective said "Correct."

## Verdicts and Sentencing

As to the crowbar attack, the jury found defendant guilty of inflicting corporal injury on a cohabitant and found he had personally used a deadly weapon. It also found him guilty of assault with a deadly weapon. As to both counts, the jury found a personal infliction of great bodily injury enhancement not true.

As to the stabbing, the jury found defendant guilty of attempted murder, finding he personally used a deadly weapon, and inflicted great bodily injury. It also found him guilty of inflicting corporal injury resulting in traumatic condition on a cohabitant, finding he personally used a deadly weapon and inflicted great bodily injury. It also found him guilty of assault with a deadly weapon with a finding of personal infliction of great bodily injury.

The jury also found that defendant had suffered three prior strike convictions: voluntary manslaughter, corporal injury, and battery with serious bodily injury.

The trial court imposed an aggregate indeterminate term of 52 years to life along with a determinative term of seven years, calculated as follows:  27 years to life for attempted murder (the upper term tripled for the strikes), along with a five-year great bodily injury enhancement, and a one-year deadly weapon use enhancement; and 25 years to life for corporal injury, along with a one-year deadly weapon use enhancement. Terms on other counts were imposed and stayed pursuant to section 654.

## DISCUSSION

### I.  Evidence Code section 1109

Defendant first contends the trial court erred in allowing the prosecution to introduce evidence of his act of domestic violence from 1992.  We find no error.

### A.  Additional Background

The prosecution moved in limine to introduce, under Evidence Code section 1109,[6] evidence of two acts of domestic violence, one from 1992 and one from 2013.

As described in the motion, in 1992, defendant went to the house of his estranged wife, and an argument erupted.  He threatened her with a knife but left when she told him to.  About one-half hour later, he returned as the victim was outside talking to the father of her daughter.  Defendant stabbed the victim five times in the chest.  As he did, he said, "If you want to be with that Nigger, you can be with him dead."  He also stabbed the father in the side.  Defendant pled to spousal abuse and admitted to inflicting great bodily injury.

The 2013 incident, involved defendant dragging the current victim by her hair across the driveway, pulling chunks of hair from her scalp.

---

[6] Undesignated statutory references are to the Evidence Code.

9

The court granted the motion as to the 2013 incident after defense counsel submitted on that incident. But defense counsel pushed for the exclusion of the 1992 incident, arguing inter alia its age rendered it presumptively excluded by statute; its relevance was far outweighed by unduly prejudicial effect, given three other domestic violence incidents were available for the jurors to consider (the 2013 incident along with the two charged incidents); and it was cumulative as it was "a different woman and almost identical facts to our case . . . ."

The trial court admitted the evidence. It noted that a higher level of scrutiny is required because the incident occurred more than 10 years ago. Nevertheless, the probative value was high given the similar conduct and similar motive to the charged stabbing. The 1992 incident was not more inflammatory given the "viciousness" involved in the current offense. Defendant's plea gave a high degree of certainly that he committed the 1992 offense. And, there was a pattern of abuse and violent conduct during defendant's adult life. The court acknowledged that defendant was paroled in 1997 and since his discharged from parole in 2000, there is no evidence of any crimes committed until mid-2012, when he was arrested for inflicting corporal injury.

The court concluded, "when I consider his entire criminal record and the circumstances of this offense, I find that the 1992 incident has substantial probative value."

## B. Analysis

On appeal, defendant argues admitting the evidence was an abuse of discretion as it was more prejudicial than probative. He notes the incident occurred more than 22 years before the earliest charged incident. And he maintains that although there were similarities, there were "significant differences" between it and the charged stabbing: he was married to the 1992 victim and they had children, while he was only living with the current victim — making the 1992 incident more egregious and inflammatory. Also, in the 1992 incident, there was no evidence the victim had a drinking problem.

10

He further argues the 1992 incident's probative value was diminished by the fact that the 2013 incident of uncharged misconduct was admitted, which also offered propensity evidence.  And as to section 352 prejudice, he argues, "the jury never learned that the probative value of the 1992 incident was lessened by the fact [defendant] led a legally blameless life for almost 22 years after the 1992 incident."  Rather the jury was left with the impression that he always resorted to violence when breaking up with women.  We disagree.

Section 1109, subdivision (a)(1) permits evidence of other domestic violence acts to show propensity for domestic violence, so long as the evidence is not made inadmissible by section 352.  (§ 1109.)  Section 352, in turn, renders evidence of past domestic violence inadmissible where the prejudicial impact substantially outweighs probative value.  (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531.)

Prior acts occurring more than 10 years before the charged offense are inadmissible unless the trial court determines their admission is in the interest of justice.  (§ 1109, subd. (e).)

On appeal, we review the admission of evidence under section 352 for abuse of discretion, reversing only if the court exercised its discretion " 'in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Megown* (2018) 28 Cal.App.5th 157, 164.)  Similarly, " '[T]he "interest of justice" exception is met where the trial court engages in a balancing of factors for and against admission under section 352 and concludes . . . that the evidence was "more probative than prejudicial." ' " (*Id*. at p. 168.)

Here, admitting evidence of the 1992 incident was well within the trial court's discretion.  As noted by the trial court, during its thorough balancing, the act itself was highly probative, involving nearly identical conduct and motive.  Also, the risk of confusion or undue time consumption was reduced because defendant pled to the conduct.  Further, what defendant offers as "significant differences," are in fact trivial

11

differences. Similarly, the fact that defendant committed a less severe act of domestic violence in 2013 does not preclude the trial court from admitting a more serious act from 1992, when that act is highly probative. And though defendant argues the jury never learned of his legally blameless life after the 1992 incident, the opposite is true. Defendant told the jury he "hadn't been in trouble for 17 to 18 years" and during closing arguments, defense counsel told the jury defendant's last felony conviction was in 1997 and he "has never been back to prison since then."

In short, though the prior act occurred long before the charged incidents, its probative value rendered its admission well within the trial court's discretion.

## II. Evidence of the Victim's Character for Violence

Defendant next contends the trial court erred in denying his motion to introduce evidence of the victim's character for violence, under section 1103. He challenges the exclusion of evidence of a 2004 domestic violence incident involving the victim and the ruling that the victim could not be impeached with her arrest for that incident. He maintains such evidence would have supported his theory of self-defense and impeached the victim's credibility. We conclude that even if it was error to preclude this evidence, the error was harmless.

## A. Additional Background

Before trial, the defense moved to impeach the victim with eight prior convictions or acts. Included in the request was a domestic violence incident from 2004 involving the victim and her then husband, who was the father of their child.[7]

As reflected in the motion, officers responded to a call that parents were fighting and the wife had a knife. Responding officers were told by the son that the victim had accused her husband of cheating. The husband was packing his things, when the victim

---

[7] There was a second domestic violence incident that year, but defendant does not challenge its exclusion in this appeal.

hit, bit, and scratched him. When the husband told the son to call the police, the victim ripped the phone cord from the wall. The victim then grabbed a steak knife and came at the father. When the father dropped a bag of clothes, the victim slashed open the bag, scattering clothes on the floor. She then threatened to stab the husband as well as a neighbor she believed he was cheating with.

The husband was able to take the knife from her. He then held her until police arrived. The victim later corroborated the husband's story when interviewed by the police, but said she had acted in self-defense and never intended to stab the husband — she only wanted to recover property she thought her husband was taking in the bag.

The defense proposed to introduce the evidence through testimony from the victim's son. The parties were unable to contact the husband, who was uncooperative.

The trial court ultimately excluded the evidence. It explained at various points in trial, "I have to say the probative value is limited. It involved a different victim a long time ago. It's not even certain that [the current victim] attempted to stab or cut . . . .her former husband." It noted the victim wasn't prosecuted for the incident, adding, "To get into that in this trial would require time, distraction, confusion of issues, all of which, in my judgment, outweigh its probative value." The court also noted the prosecutor could elicit from the son, other incidents of violence by the defendant that the son had witnessed.

It also explained: "I'm finding that the incident itself is too remote in time . . . and lacks sufficient probative value, and even if it is deemed to have any probative value, I find it to be very slight in comparison to the risk of prejudice and undue consumption of time and confusion of issues." Further: "In my mind this is a classic 352 situation where to go down that road would invite confusion of issues and result in undue consumption of time and a risk of prejudice, so I find that it lacks sufficient evidentiary value under 352 of the Evidence Code."

The trial court also denied the defense's request to impeach the victim with domestic violence incidents from 2004.[8]

## B. Analysis

On appeal, defendant argues the evidence was clearly relevant to prove the victim's aggressive and violent character as well as to impeach her character for truthfulness. And even if refusing to allow the son to testify was proper, the court could have allowed the defense to cross-examine the victim about the 2004 incident and impeach her with her arrest for domestic violence.

Even if it was error to preclude this evidence, any error was harmless.

As to the crowbar attack, defendant testified he had intended to hit someone other than the victim with the crowbar when he threw it. Thus, the victim's character for violence and truthfulness was irrelevant to the defense's theory and could have no effect on the verdict.

As to the stabbing, the proffered evidence of the victim's character for violence and truthfulness would not have altered the outcome. Defendant's trial testimony — that the unarmed victim repeatedly ran into him as he "poked" her with the knife — defied credulity and the evidence of the victim's past character for violence would not have helped him. But more importantly, defendant's testimony was undermined by his own statements to a detective after the stabbing — admitting he stabbed the unarmed victim because he was upset and angry.

In sum, any error in refusing to admit evidence of the victim's domestic violence incident from 2004 was harmless.

---

[8] The court did allow impeachment of the victim with a 2016 felony auto theft conviction and a 2000 misdemeanor grand theft conviction.

### III.  The 911 Call

Defendant next challenges the admission of a 911 call recording as a spontaneous declaration.  He argues the prosecution failed to establish the declarant perceived the event she described.  We disagree.

### A.  Additional Background

Pretrial, the prosecution sought to admit, evidence of the victim's cousin's 911 call, as a spontaneous statement under section 1240.[9]  The cousin did not testify at trial.

In the 911 call, a dispatcher asked the cousin, "[w]hat's going on?"  The cousin responded:  "my cousin . . . had a altercation with her boyfriend, we all was over here, and he hit her in the head twice with a crowbar, she's bleedin' everywhere…"  The cousin continued, "[H]e took her money, hit her in the head twice with a crowbar, she's bleedin' everywhere, he took his monster truck and ran over my car while I was sitting in my car."

To a fire dispatcher, the cousin repeated:  "My cousin had a altercation with her boyfriend, he took her money and she was tryin' to get her money back, and he got mad, very upset, I don't know what the problem was, and he hit her twice in the head with a crowbar, she's bleeding everywhere . . .  [¶]  [H]e — he took off running, a — after he hit her twice in the head with the crowbar, he took his car and ran over my car while I was sittin' in the vehicle…  [¶]  waitin' on her…"

At one point the dispatcher asked: "Okay, are there …  [¶]  … (unintelligible) injury?"  The cousin replied: "No, I — ma'am, that's the only two thing I seen him do,

---

[9]  "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."  (§ 1240)

15

but I — she's like slurring with words, I don't know, I'm — I don't know I'm not a…
[¶] doctor."

Defense counsel objected to the recording, arguing nothing evinced the declarant had actually perceived what she described. Counsel pointed to the cousin's statement to a deputy that "[*W*]*e got out of the car and started running and [the victim] didn't run; and he hit her with the crowbar*." Counsel argued, "[S]he is running away when the incident happens, so it's unlikely if she perceived it, if she is running away from where she said the incident happened."

Counsel also pointed to the victim's preliminary hearing testimony describing the attack: "I just felt the blood falling out. So I end up running back to the house and I had my cousins call the police and the ambulance." Counsel argued this too suggested her cousin had not witnessed the attack but was told about it by the victim.

The trial court admitted the evidence, finding an adequate showing of personal knowledge. It noted the cousin's statement, "*that's the only two thing I seen him do*," corresponded to her earlier statements that defendant hit the victim twice with a crowbar. The cousin also provided enough detail to infer she personally observed it. She talked about a crowbar, the two blows, the "monster truck" defendant drove, and the altercation over money preceding the attack. And nothing in the recording suggested the cousin heard of the attack from someone else.

Midtrial, the defense moved for mistrial, arguing a deputy's testimony,[10] "did not confirm or clarify [the cousin] was, in fact a percipient witness . . . ." The trial court

---

[10] On cross-examination, the deputy testified that he spoke to the cousin at the crime scene. The cousin said that immediately before defendant hit the victim with a crowbar, the cousin was running away from her car. The deputy could not recall if he asked the cousin if the victim had told her she had been hit by a crowbar, or if the cousin had assumed she had been hit. On redirect, the deputy testified that the cousin indicated that she got out of the car and started running, but the victim didn't run, and defendant hit her with the crowbar. She then called 911.

16

denied the motion, noting the cousin's statements to the deputy were not "particularly inconsistent with what was stated in the 911 call." While allowing that the deputy's testimony did not definitively answer whether the cousin personally witness the incident, the court noted prosecution's examination of the deputy suggested the cousin had personal knowledge.

**B. Analysis**

On appeal, defendant challenges the admission of the 911 call, arguing there was no evidence the cousin witnessed defendant hit the victim with the crowbar. He again points to the victim's preliminary hearing testimony and the deputy's trial testimony, arguing, "The only reasonable inference" is that the cousin and victim were running when the victim was struck from behind. Thus, the cousin was not a percipient witness to the attack. We cannot agree.

Under section 1240, "[A] hearsay statement, even if otherwise spontaneous, is admissible only if it relates to an event the declarant perceived personally." (*People v. Phillips* (2000) 22 Cal.4th 226, 235.) " 'It must . . . appear "in some way, at least, and with some degree of persuasive force" that the declarant was a witness to the event to which his utterance relates. [Citation.] Although this does not require direct proof that the declarant actually witnessed the event and a persuasive inference that he did is sufficient, the fact that the declarant was a percipient witness should not be purely a matter of speculation or conjecture.' " (*Id*. at p. 236.) On appeal, "[W]e will uphold the trial court's determination if it is supported by substantial evidence." (*Ibid*.)

Here, substantial evidence supports the trial court's finding. As the trial court explained, the cousin specifically referred to the "the only two thing I seen him do," which by all indications referred to the two crowbar hits. The cousin described the attack several times, offering sufficient details to infer she personally witnessed the incident. And nothing indicates she was relaying what she was told by someone else. Indeed,

17

where she did not know something, she made it clear: "I don't know what the problem was . . . "

Defendant's argument that because the cousin was running during the attack, she could not see the attack, is speculation. Indeed, nothing suggested where the cousin was relative to the defendant and the victim at that time; nor did the evidence preclude the cousin from looking in the victim's direction at the same time she was running.

The contention therefore fails.

## IV. Substantial Evidence of Intent to Kill

Defendant contends insufficient evidence supports the finding that he acted with intent to kill. He argues the evidence failed to establish the extent and severity of the victim's injuries. And he notes no medical personal were called as witnesses nor did expert testimony establish the victim sustained life-threatening injuries. He also avers the evidence that he threatened to kill the victim was conflicting and susceptible to reasonable doubt. Again, we disagree.

When assessing the sufficiency of the evidence, " '[W]e review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*).) We look for " 'evidence that is reasonable, credible, and of solid value,' " and in so doing, " 'we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*Ibid.*) Neither conflicts nor testimony subject to suspicion justify reversal — credibility determination and the truth or falsity of facts are the exclusive providence of the factfinder. (*Ibid.*) [R]eversal . . . " ' "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*Ibid.*)

Here, sufficient evidence supports a finding of intent to kill. Defendant stabbed the victim about 12 times, including to her neck, back, and sides. The jury was also

18

shown photos of the stab wounds and the crime scene.  Defendant ceased the attack only when police lights could be seen, and then he ran out the kitchen door through the backyard.

Further, the fact that no medical evidence was presented does not preclude a finding of intent to kill.  (See *People v. Avila* (2009) 46 Cal.4th 680, 702 [degree of resulting injury is not dispositive of intent; "[A] defendant may properly be convicted of attempted murder when no injury results"].)

The jury could also have relied on the victim's statement to a detective, at the hospital, that defendant had said he wanted to kill her just before the stabbing.  To that, defendant responds that the victim told a social worker, several days later, that defendant "wasn't really saying anything" and at trial the victim testified that defendant said nothing while he stabbed her.  Defendant adds that when the victim spoke to the detective, she was in the ICU and likely on heavy pain medication, a contention that seems at odds with his claim that her injuries were not severe.

Again, credibility and the veracity of facts are the exclusive providence of the factfinder, and reversal is unwarranted unless on no hypotheses whatever does substantial evidence support the finding.  (*Penunuri*, *supra*, 5 Cal.5th at p. 142.)  The contention therefore fails.

## V.  Instruction Error

Defendant contends the court erred in removing the definition of abuse when it instructed the jury with CALCRIM No. 852, regarding evidence of uncharged domestic violence.  We find no error.

### A.  Additional Background

Just prior to jury instruction, defense counsel asked the trial court to reinsert un-bracketed language from CALCRIM No. 852 defining abuse.  CALCRIM No. 852 pertains to evidence of uncharged domestic violence and instructs the jury on how and when it may consider such evidence.  Counsel specifically asked that the court include

19

language that " 'abuse means intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable fear of imminent serious bodily injury to himself/herself.' " The court interjected, "Okay. I'm rejecting that request as well because in my mind, it's just confusing. The only terms that need to be defined are defined in there, and abuse is not one of them."

The jury was ultimately instructed, in pertinent part, as follows: "The People presented evidence that the defendant committed domestic violence that was not charged in this case . . . . [¶] Domestic violence means *abuse* committed against an adult who is a former spouse. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence." (Italics added)

The instruction continued: "If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit the crimes charged in this case."

Just before receiving that instruction, the jury was given a definition of abuse as part of CALCRIM No. 3163 (great bodily injury under circumstances involving domestic violence), which was identical to the instruction defendant had requested be repeated as part of CALCRIM No. 852: "Abuse means intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable fear of imminent serious great bodily injury to himself or herself or to someone else."

### B. Analysis

On appeal, defendant argues omitting the definition of abuse from CALCRIM No. 852 relieved the prosecution of its burden of proof and suggested its burden to prove domestic violence was far less than what the law requires. The People respond that the trial court gave the precise definition defendant requested just before instructing on

20

CALCRIM No. 852. To that, defendant replies that the jury would have no reason to apply the definition of abuse from CALCRIM No. 3163 to CALCRIM No. 852. The contention is meritless.

Here, the jury was given the precise definition of abuse defendant requested. It was also instructed to "[p]ay careful attention to all of these instructions *and consider them together*." (Italics added) Because CALCRIM Nos. 3163 and 852 contained identical definitions of abuse, and because the jury was instructed on them sequentially, omitting one of those definitions to avoid repetition was not erroneous. (See *People v. Gurule* (2002) 28 Cal.4th 557, 659 ["[A] trial court may refuse a proffered instruction if it is . . . duplicative"].) Though we do not necessarily agree with the trial court's stated reason for refusing to include the abuse definition, we see no error in its exclusion, when to include it would be needlessly duplicative.

The contention therefore fails.

## VI. Cumulative Error

Defendant contends the above errors were cumulatively prejudicial. We have rejected every contention raised, save for the second contention, to which we assumed error and found it harmless. (See *In re Reno* (2012) 55 Cal.4th 428, 483 ["claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate"].) We accordingly find no cumulative error.

## VII. Establishing the Nature of a Prior Conviction

Defendant contends his Sixth and Fourteenth Amendment rights were violated when the jury was allowed to consider the preliminary hearing transcript in determining whether his one of his three prior convictions was a strike. The People concede error, and we agree.

Defendant was alleged to have suffered three prior strikes, including a 1989 conviction for assault with serious bodily injury (Pen. Code, § 243, subd. (d)). Such

21

offenses, however, are only strikes if the defendant personally inflicted great bodily injury during the commission. (Pen. Code, § 1192.7, subd. (c)(8); *People v. Bueno* (2006) 143 Cal.App.4th 1503, 1508.)

Midtrial, the defense asked the court to dismiss the 1989 prior strike because the prosecution could not prove the nature of the conviction. Counsel noted: "It is not permissible to attempt to prove up a strike prior through extraneous documents like [preliminary hearing transcripts]." The court disagreed.

Thereafter, a transcript of the preliminary hearing was admitted, and the jury subsequently found defendant had personally inflicted serious bodily injury during the 1989 offense.

A little less than a year later, *People v. Gallardo* (2017) 4 Cal.5th 120, 137, was published and held that relying on a preliminary hearing transcript to determine the nature of a prior conviction is impermissible. If the relevant facts are neither found by a jury nor admitted by a defendant when entering a guilty plea, they cannot serve as the basis for an increased sentence. (*Ibid.*)

We agree with the parties that based on *Gallardo*, the finding of the 1989 prior strike must be reversed for insufficient evidence.

The parties, however, part ways as to whether remand is necessary. On that point, we agree with the People, and remand to afford the prosecution an opportunity to establish the prior strike if it chooses to do so. We understand that the plea colloquy from the 1989 conviction may have been purged, which could make such proof impossible. Nevertheless, we will remand to afford the prosecution the opportunity — should it so choose — to present appropriate evidence regarding the nature of the conviction.

### VIII. The *Romero* Motion

Defendant contends remand is required to allow the trial court to make an informed decision regarding whether to strike one or more of the prior strikes. We disagree.

22

## A. Additional Background

At sentencing defendant moved, under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, to strike one or more of his prior strikes. In considering the motion, the trial court was apparently under the impression that defendant had suffered four prior strikes, rather than three: "To achieve any kind of sentence relief, basically, I would have to strike all of his prior strikes. Right? Or at least three of them?" Defense counsel responded, "Correct," and the court replied, "He's got four."[11]

The trial court went on to deny the motion, explaining: "The primary argument, as I understand your motion, is that the defendant remained, apparently, crime free from late 1997 when he got out of prison at about 42 or 43 years of age and then — that was after he was imprisoned for stabbing [his estranged wife] and the other man. [¶] Basically, he remained free of custody and conviction of any significant new offenses for about 17 years, . . . until the new offenses upon [the victim]." Defense counsel responded, "Correct."

The trial court denied the motion explaining, that the pause in violent crime commission notwithstanding, "I don't believe that [defendant] falls outside the spirit of three strikes law. Recent crimes for which he was convicted from this trial are extremely serious, and they are basically cut from the same cloth as the prior convictions." The court added: "He inflicted serious violence. He used a knife yet again, so I am going to deny the motion for those reasons."

---

[11] The People argue that nothing indicates the trial court was misinformed as to the number of prior strikes, and defense counsel in fact informed the court that defendant had only three prior strikes. We disagree. Defense counsel did not expressly correct the court, stating only: "[I] would ask the Court to strike the three strikes, or in the alternative, strike two of the strikes." And moments later the trial court stated, "Because he has three — four prior strike convictions, the attempted murder, the domestic violence with great bodily injury, assault with a knife, and battery with serious bodily injury . . . ."

## B.  Analysis

On appeal, defendant maintains remand is necessary for the trial court to make an informed determination.  He argues because he in fact had three strikes — and as discussed above (see section VII) only two strikes were properly found — the matter must be remanded for the trial court to make an informed determination.

We disagree that remand is required.  For one, two prior strikes still suffice to render the current offenses third strikes.  For another, given the violent nature of the current offense and the violent nature of the prior strikes, we cannot see how a finding that defendant fell outside the spirit of the Three Strikes law would be a proper exercise of discretion.  We therefore find remand unwarranted.

## IX.  Dueñas

Finally, in a supplemental brief defendant contends remand is required for an ability to pay hearing with respect to the fines and fees imposed at sentencing.  He cites in support *Dueñas, supra,* 30 Cal.App.5th 1157, which held that due process requires the trial court to stay execution of restitution fines, as well as court operation and conviction assessments, until it has held a hearing and determined the defendant has the present ability to pay.

We join courts concluding *Dueñas* was wrongly decided and hold that defendant is not entitled to an ability to pay hearing for the conviction and operation assessments. (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted November 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055; *People v. Caceres* (2019) 39 Cal.App.5th 917, 923-929.)  We therefore reject the contention.

## DISPOSITION

We modify the judgment to strike the finding of a prior strike based on defendant's 1989 conviction for battery with serious bodily injury (Pen. Code, § 243,

subd. (d)).  The matter is remanded to afford the prosecution an opportunity, if it chooses, to establish that prior strike.  In all other respects, we affirm.


                                    /s/
                             MURRAY, J.


We concur:


    /s/
RAYE, P. J.


    /s/
BLEASE, J.

25