Filed 1/24/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

<table>
<tr><td>RODRIGO RODRIGUEZ PRECIADO et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>FREIGHTLINER CUSTOM CHASSIS CORPORATION,<br><br>    Defendant and Respondent.</td><td>D079536<br><br><br>(Super. Ct. No. 37-2021-00007896-CU-PA-NC)</td></tr>
</table>

APPEAL from an order of the Superior Court of San Diego County, Earl H. Maas, III, Judge. Affirmed.

Law Offices of Otto L. Haselhoff and Otto L. Haselhoff for Plaintiffs and Appellants.

Nelson Mullins Riley & Scarborough, Philip R. Cosgrove and Ryan E. Cosgrove for Defendant and Respondent.

Plaintiffs Rodrigo Rodriguez Preciado, Norma Janeth Banda Arreola, Alejandro Rodriguez Banda, and Haydee Antonieta Zumaeta (Plaintiffs) appeal from an order granting the motion to quash service of summons filed

by defendant Freightliner Custom Chassis Corporation (FCCC). Plaintiffs contend that the trial court erred in concluding that they failed to establish that California has general or specific jurisdiction over FCCC in this action.

We conclude that Plaintiffs' arguments lack merit, and accordingly we affirm the order granting FCCC's motion to quash and dismissing it from this action.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

This litigation arises from a February 22, 2020 bus accident that occurred on Interstate 15 in San Diego County, resulting in the death of Cynthia Karely Rodriguez Banda (Cynthia)[1] and injury to Zumaeta.

On February 22, 2021, Zumaeta, along with Cynthia's parents and brother (as survivors), filed a lawsuit against several defendants. The defendants included (1) the bus owners/operators; (2) the bus driver; (3) the California Department of Transportation; (4) the manufacturer of the bus (alleged to be General Coach America, Inc.); (5) the alleged manufacturer of the bus's tires; and (6) the alleged manufacturer of the bus's seats and seat belts. As specifically relevant here, the defendants also included FCCC, which manufactured the bus's chassis.[2] All of the causes of action asserted against FCCC were based on various theories of products liability.[3]

---

[1]  We refer to Cynthia by her first name to distinguish her from plaintiffs with the same surnames, and we intend no disrespect by doing so.

[2]  FCCC was erroneously identified in the complaint as "Freightliner."

[3]  Specifically, the complaint alleged the following causes of action against FCCC:  "products liability - negligence," "products liability - failure to warn," "products liability - strict liability," "products liability - breach of

On April 1, 2021, FCCC specially appeared in the action and filed a motion to quash service of summons based on lack of personal jurisdiction in California. (Code Civ. Proc., § 418.10.)[4] FCCC argued that Plaintiffs could not "meet their burden of establishing the requisite connection between FCCC, California, and this litigation to justify general or specific jurisdiction over FCCC."

FCCC supported its motion with the declaration of Dennis Rostenbach, who holds a position in "FCCC Dealer Operations/Product Litigation" at FCCC. Rostenbach stated that FCCC is a Delaware corporation with its principal place of business in Gaffney, South Carolina. According to Rostenbach, "FCCC does not own property in California," "FCCC does not manufacture and/or assemble vehicles in California," "FCCC has one employee in California who works remotely from his home," and "FCCC has approximately 800 employees in South Carolina." Rostenbach explained that

---

warranties," and "products liability - misrepresentation/concealment." (Capitalization omitted.)

[4] The hearing on the motion to quash was noticed for July 9, 2021, which was the first hearing date available on the trial court's calendar, and was 99 days after FCCC filed its motion on April 1, 2021. The Code of Civil Procedure states that, in filing a motion to quash, "[t]he notice shall designate, as the time for making the motion, a date not more than 30 days after filing of the notice." (Code Civ. Proc., § 418.10, subd. (b).) In the trial court, Plaintiffs argued that the motion to quash "must be denied" for failure to have the motion heard within 30 days. They raise the argument again in their appellate briefing. The contention lacks merit. A "tardy hearing date on a motion . . . under section 418.10" does not "deprive[ ] the trial court of jurisdiction to consider the merits of the motion." (*Olinick v. BMG Entertainment* (2006) 138 Cal.App.4th 1286, 1296; see also Edmon & Karnow, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2022) ¶ 3:381 ["scheduling a hearing date *beyond* 30 days does not invalidate the motion"].)

"FCCC designs, manufactures, assembles and sells chassis, which are incomplete vehicles," but it "does not design, manufacture, assemble, advertise or sell buses."

Based on the vehicle identification number of the bus involved in the accident, Rostenbach determined that FCCC was the manufacturer of the bus's chassis. As shown by the invoice attached to Rostenbach's declaration, the chassis was sold by FCCC in 2013 to Champion Bus, Inc., which was located in Imlay City, Michigan. FCCC assembled the chassis in South Carolina according to the buyer's specifications. According to Rostenbach, "The subject . . . chassis was not designed, assembled, advertised or sold by FCCC in California." Rostenbach stated that "FCCC has no control over where the purchasers of its chassis market and sell their completed vehicles." As Rostenbach explained, "FCCC did not market, advertise, distribute or sell the subject bus, which Plaintiffs claim is defective, in California."

Plaintiffs filed an opposition on June 25, 2021. The sole evidence relied upon by Plaintiffs in support of their opposition were two groups of printouts from internet websites.

The first group of printouts was from FCCC's website. In their opposition briefing, Plaintiffs focused on language in those printouts describing FCCC's market share for chassis: "As the world's largest manufacturer of diesel walk-in van chassis, nearly two-thirds of all diesel walk-in van chassis sold today are made by FCCC. We also hold more than half the market in Class A diesel motorhome chassis and more than a quarter of the market in conventional school bus chassis." Plaintiffs also focused on the portion of FCCC's website that identified independent service centers where FCCC's products could be serviced. The FCCC website states, "Freightliner Custom Chassis owners have access to the industry's largest

4

service network, comprised of more than 450 Freightliner branded service locations throughout North America." Those service centers include at least 15 locations in California.

The second group of printouts was from the website of Velocity Truck Centers, which has several locations in California, and in other states. The printouts appear to indicate that Velocity Truck Centers is a dealer that sells chassis manufactured by FCCC. The printouts depict two models of FCCC chassis, but not the model of chassis that is at issue in this litigation.[5]

Plaintiffs filed objections to Rostenbach's declaration. They also requested, in the alternative, that the hearing on the motion to quash be continued by 180 days to permit them to conduct discovery. However, Plaintiffs did not set forth any specific jurisdictional discovery that they intended to pursue or point to any jurisdictional discovery that they had already propounded in the 85 days since FCCC filed its motion to quash.

In its reply, FCCC confirmed that Plaintiffs had not propounded any discovery specifically designed to develop facts relating to the issue of personal jurisdiction. Instead, on June 10, 2021, Plaintiffs propounded lengthy discovery requests to FCCC that were *not* targeted to issues of personal jurisdiction.[6]

---

[5]     Specifically, the printouts from the Velocity Truck Centers website depict the "Freightliner Custom Chassis MT" and the "Freightliner Custom Chassis MT50e." The model sold by FCCC to Champion Bus, Inc. was the "2014 Freightliner S2 chassis."

[6]     In its reply, FCCC also submitted discovery responses from Plaintiffs establishing that, contrary to the allegations in the complaint, the family members of Cynthia who are plaintiffs in this action are residents of Mexico, not California. The complaint alleged that plaintiff Zumaeta is a resident of California, and FCCC did not submit evidence to challenge that allegation.

At a July 9, 2021 hearing, the trial court denied Plaintiffs' request for a continuance to conduct discovery, overruled Plaintiffs' objections to Rostenbach's declaration, and granted FCCC's motion to quash.

Plaintiffs appeal from the order granting FCCC's motion to quash and dismissing FCCC from the action.[7]

## II.

## DISCUSSION

A.   *The Trial Court Did Not Abuse Its Discretion in Denying the Request to Continue the Motion to Permit Discovery or by Overruling Plaintiffs' Objections to Rostenbach's Declaration*

Before turning to the merits of FCCC's personal jurisdiction challenge, we consider two preliminary issues.  Specifically, Plaintiffs contend the trial court erred in (1) denying their request for a continuance of the motion to quash so they could conduct discovery; and (2) overruling their objections to Rostenbach's declaration.

---

[7]   In connection with this appeal, Plaintiffs have filed two requests for judicial notice.  The first request, filed April 11, 2022, provides color printouts of the website pages of FCCC and Velocity Truck Centers that Plaintiffs submitted in the trial court to support their opposition to FCCC's motion to quash.  Because Plaintiffs perceive those printouts to be difficult to read as they appear in the black and white reproductions in the appellate record, they have provided us with more legible color printouts, and they ask that we take judicial notice of them.  We grant the April 11, 2022 request.  In their second request, filed September 14, 2022, Plaintiffs ask that we take judicial notice of an Illinois appellate court case and a federal district court opinion, and they provide copies of those opinions, both of which are also available through legal research databases, including Westlaw and LEXIS.  As Evidence Code section 452 provides that "[j]udicial notice may be taken of . . . (a) The decisional, constitutional, and statutory law of any state of the United States and the resolutions and private acts of the Congress of the United States and of the Legislature of this state," we grant Plaintiffs' September 14, 2022 request for judicial notice.

1. *Plaintiffs' Request for a Continuance to Conduct Discovery*

Plaintiffs requested in their opposition memorandum that the trial court continue the motion to quash for 180 days to allow them to conduct discovery relevant to personal jurisdiction. Plaintiffs contend that the trial court erred in denying their request.

"A trial court has the discretion to continue the hearing on a motion to quash service of summons for lack of personal jurisdiction to allow the plaintiff to conduct discovery on jurisdictional issues." (*HealthMarkets, Inc. v. Superior Court* (2009) 171 Cal.App.4th 1160, 1173.) "In order to prevail on a motion for a continuance for jurisdictional discovery, the plaintiff should demonstrate that discovery is likely to lead to the production of evidence of facts establishing jurisdiction." (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 127 (*Automobile Antitrust Cases*).) Because the decision to grant a continuance is a discretionary decision, "[o]n appeal, we will not reverse the trial court's ruling unless we find a manifest abuse of that discretion." (*Ibid*.)

Here, although Plaintiffs requested a continuance for the purpose of conducting discovery on jurisdictional issues, they failed to identify any specific area of inquiry that they would pursue if they were allowed to conduct discovery. In his declaration, Plaintiffs' counsel described the discovery he sought to conduct in extremely vague terms: "Plaintiffs seek to take depositions, engage in limited written discovery, and probe the connections of the moving defendant to the forum state, and inquire as to the claims regarding non-connection by moving defendant, among other things." In addition, there were 85 days between the April 1, 2021 filing of FCCC's motion to quash and the June 25, 2021 filing of Plaintiffs' opposition to that motion, and 99 days between the filing of the motion and the hearing date.

7

However, Plaintiffs did not use that time period to propound *any* discovery targeted to the issue of personal jurisdiction. On the contrary, on June 10, 2021, Plaintiffs propounded lengthy discovery requests on FCCC, but Plaintiffs did not design that discovery to lead to evidence relevant to issues of personal jurisdiction.[8]

In denying the continuance, the trial court specifically focused on Plaintiffs' failure to propound jurisdictional discovery when they had the opportunity to do so, and on their failure to identify the specific discovery they would pursue if given a continuance. As explained in the order granting the motion to quash: "The Court finds, as stated in the reply papers, that plaintiffs have had since the motion was filed on April 1, 2021 to propound discovery regarding the jurisdictional issues, but have failed to do so. Instead, plaintiffs propounded discovery regarding issues that were unrelated to the motion to quash for lack of' jurisdiction. Plaintiffs also failed to submit

---

[8]     In their appellate briefing, Plaintiffs point to two of the 174 categories of documents described in their June 10, 2021 request for production propounded on FCCC. Request No. 95 asked for "All DOCUMENTS PERTAINING to the manufacture of YOUR PRODUCT, limited to those DOCUMENTS that PERTAIN to the CLAIMED DEFECT." Request No. 100 asked for "All DOCUMENTS PERTAINING to the chain of distribution of YOUR PRODUCT, limited to those DOCUMENTS that PERTAIN to the CLAIMED DEFECT." Based on these requests, Plaintiffs contend that they did, in fact, start the process of attempting to obtain discovery related to personal jurisdiction. We are not persuaded. Based on our review of the 174 requests for production and the 38 special interrogatories propounded by Plaintiffs on FCCC, the discovery propounded by Plaintiffs was *not* targeted to the issue of personal jurisdiction, and instead was directed at developing the elements of their causes of action. Moreover, Plaintiffs did not identify these two requests when arguing for a continuance in the trial court in order to conduct jurisdictional discovery.

the specific discovery or description of the discovery they seek to propound for the Court's consideration."[9]

Because Plaintiffs failed to articulate what specific facts they would seek to develop if granted a continuance, the trial court could reasonably conclude that Plaintiffs did not "demonstrate that discovery is likely to lead to the production of evidence of facts establishing jurisdiction." (*Automobile Antitrust Cases*, *supra*, 135 Cal.App.4th at p. 127.) Accordingly, the trial court did not abuse its discretion by denying Plaintiffs' request for a continuance of the motion to quash to conduct discovery. (See *Thomson v. Anderson* (2003) 113 Cal.App.4th 258, 271 [the trial court did not abuse its discretion in implicitly denying a request for a continuance of a motion to quash to allow discovery when, among other things, "counsel did not identify what kind of discovery she wanted to take or what kind of jurisdictional facts she believed discovery would disclose"].)

2.      *Plaintiffs' Objections to Rostenbach's Declaration*

Plaintiffs filed objections to almost every paragraph in the Rostenbach declaration. They objected on grounds that included lack of foundation,

---

[9]      During the motion hearing, the trial court provided a similar explanation for why it was denying the request for a continuance: "And with respect to the request for further discovery, I don't have before me the request for specific further discovery which would aid in the determination with respect to jurisdiction. . . . And then I've got . . . the specially appearing part[y's] response saying we've got other discovery, none of it dealt with this jurisdictional issue. And so I'm going to deny the request. I agree that I prefer to allow discovery to go forward whether it's a jurisdictional issue, but almost invariably I get that request two months before the hearing. And I get it with specific here's the interrogatories we would like to set. Here is the individual we would like to depose that will help us on the jurisdictional issue. . . . I understand why the special appearing party is named here, but in this particular unique case, I'm going to have to rule against you."

conclusory, irrelevant, calls for speculation, and lack of personal knowledge. The trial court overruled the objections.

On appeal, Plaintiffs contend that their objections should have been sustained because Rostenbach had no personal knowledge of the matters discussed in his declaration, and thus his statements lacked foundation. According to Plaintiffs, "the declaration did not state the basis of [Rostenbach's] personal knowledge nor provide admissible evidence establishing his personal knowledge."

The Evidence Code provides that "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter." (Evid. Code, § 702, subd. (a).) "A witness' personal knowledge of a matter may be shown by any otherwise admissible evidence, including his own testimony." (*Id.*, subd. (b).) In determining whether the trial court properly concluded a declarant had personal knowledge, "we will uphold the trial court's determination if it is supported by substantial evidence. . . . We review for abuse of discretion the ultimate decision whether to admit the evidence." (*People v. Phillips* (2000) 22 Cal.4th 226, 236.)

Here, Rostenbach's declaration explained the nature of his employment at FCCC and his familiarity with its records and corporate operations. Rostenbach declared, "I make this declaration based on personal experience and knowledge of the facts set forth herein, which includes my review of the books and records of FCCC that are kept in the ordinary course of business, as well as personal knowledge obtained during my employment by FCCC in the ordinary course of my duties. [¶] . . . I have been employed by FCCC since August of 1996. I have held the position of FCCC Dealer Operations/Product Litigation since 1998. In my role with the company, I have become familiar with the record-keeping of FCCC and its organizational

10

structure, as well as that of other corporate entities that are affiliated with FCCC, such as Daimler Trucks North America LLC. [¶] . . . Based on my employment with FCCC, I have knowledge of the operations of FCCC. I am also familiar with records created and maintained in the ordinary course of business of FCCC."

These statements provide substantial evidence to support a finding that Rostenbach had personal knowledge of the matters set forth in his declaration. (See *Tutti Mangia Italian Grill, Inc. v. American Textile Maintenance Co.* (2011) 197 Cal.App.4th 733, 742 [a foundation was properly laid for a declaration where the witness explained the basis for his personal knowledge].) The trial court accordingly did not abuse its discretion in overruling Plaintiffs' objections to Rostenbach's declaration based on lack of personal knowledge.

B.    *The Trial Court Did Not Err in Granting the Motion to Quash*

We now turn to the central issue presented in this appeal: whether the trial court erred in concluding that Plaintiffs failed to establish that California had personal jurisdiction over FCCC in this action.

The standard of review in an appeal from an order granting a motion to quash for lack of personal jurisdiction is well-settled. "In reviewing a trial court's determination of jurisdiction, we will not disturb the court's factual determinations 'if supported by substantial evidence.' [Citation.] 'When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record.' " (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 273 (*Pavlovich*).) Here, the parties do not identify any factual disputes that the trial court was required to resolve. We accordingly conduct an independent review.

11

A California court "may exercise personal jurisdiction on any basis consistent with the Constitutions of California and the United States." (*Pavlovich, supra*, 29 Cal.4th at p. 268; see also Code Civ. Proc., § 410.10.) "The exercise of jurisdiction over a nonresident defendant comports with these Constitutions 'if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate " 'traditional notions of fair play and substantial justice.' " ' " (*Pavlovich*, at p. 268.) "Under the minimum contacts test, 'an essential criterion in all cases is whether the "quality and nature" of the defendant's activity is such that it is "reasonable" and "fair" to require him to conduct his defense in that State.' " (*Ibid.*)

"When a defendant moves to quash service of process on jurisdictional grounds, the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 (*Vons*).) "The plaintiff must come forward with affidavits and other competent evidence to carry this burden and cannot simply rely on allegations in an unverified complaint." (*Buchanan v. Soto* (2015) 241 Cal.App.4th 1353, 1362.) "Once facts showing minimum contacts with the forum state are established, however, it becomes the defendant's burden to demonstrate that the exercise of jurisdiction would be unreasonable." (*Vons*, at p. 449.)

There are "two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." (*Ford Motor Co. v. Montana Eighth Judicial Dist. Court* (2021) ___ U.S. ___, ___ [141 S.Ct. 1017, 1024] (*Ford Motor*).) Plaintiffs contend that they "established both general and specific jurisdiction." We accordingly consider each in turn.

1. *General Jurisdiction*

"A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State. [Citation.] General jurisdiction, as its name implies, extends to 'any and all claims' brought against a defendant. [Citation.] Those claims need not relate to the forum State or the defendant's activity there; they may concern events and conduct anywhere in the world. But that breadth imposes a correlative limit: Only a select 'set of affiliations with a forum' will expose a defendant to such sweeping jurisdiction. [Citation.] In what [the Supreme Court] ha[s] called the 'paradigm' case, an individual is subject to general jurisdiction in her place of domicile. [Citation.] And the 'equivalent' forums for a corporation are its place of incorporation and principal place of business." (*Ford Motor*, *supra*, 141 S.Ct. at p. 1024.)

Although a defendant's state of incorporation and principal place of business are the paradigmatic indications that a corporation is "at home" in a state, "in an exceptional case . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." (*Daimler AG v. Bauman* (2014) 571 U.S. 117, 139, fn. 19 (*Daimler AG*), citing *Perkins v. Benguet Consolidated Mining Co.* (1952) 342 U.S. 437.) For example, in *Perkins*, the Supreme Court held that a corporation was subject to general personal jurisdiction in Ohio, even though it was organized in the Philippines and normally conducted its operations there, because its business operations were temporarily relocated to Ohio during wartime. (*Perkins*, at pp. 448-449.) The inquiry is "whether th[e] corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.' " (*Daimler AG*, at p. 139.)

13

Here, the undisputed facts are that FCCC is a Delaware corporation, and its principal place of business is in South Carolina. It does not have any offices or facilities in California. Plaintiffs have submitted website printouts suggesting that some of FCCC's products are sold and serviced in California (through independent dealers), but those types of contacts do not establish that FCCC is "at home" in California. As the Supreme Court has made clear, general jurisdiction requires *more* than a showing that "a corporation 'engages in a substantial, continuous, and systematic course of business' " in a state. (*Daimler AG*, *supra*, 571 U.S. at pp. 137-138.) Instead, the state must hold the particular position of being the location where the corporation is "at home." (*Id.* at p. 139, fn. 20 ["A corporation that operates in many places can scarcely be deemed at home in all of them."].) Accordingly, Plaintiffs have not met their burden to show that FCCC is subject to general jurisdiction in California.

2. *Specific Jurisdiction*

In contrast to general jurisdiction, specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims. The contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.' " (*Ford Motor, supra*, 141 S.Ct. at p. 1024.) For a state to have specific jurisdiction, the defendant "must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.' [Citation.] The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.' [Citation.] They must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there. [Citation.] Yet even then—because the defendant is not 'at home'—the forum State may exercise jurisdiction in only

14

certain cases. The plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum." (*Id.* at pp. 1024-1025.)

Thus, a two-part showing by the plaintiff is required to establish specific jurisdiction: "[(1)] the defendant has 'purposefully directed' his activities at residents of the forum, . . . and [(2)] the litigation results from alleged injuries that 'arise out of or relate to' those activities." (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 472-473, citation omitted.)

### a. *Purposeful Availment*

We first consider whether Plaintiffs have established that FCCC purposefully availed itself of the privilege of conducting activities within California.

"[P]urposeful availment occurs where a nonresident defendant ' "purposefully direct[s]" [its] activities at residents of the forum' [citation], ' "purposefully derive[s] benefit" from' its activities in the forum [citation], 'create[s] a "substantial connection" with the forum' [citation], ' "deliberately" has engaged in significant activities within' the forum [citation], or 'has created "continuing obligations" between [itself] and residents of the forum.' " (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1063.) " ' "The purposeful availment inquiry . . . focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on" his contacts with the forum.' (*Pavlovich, supra*, 29 Cal.4th at p. 269.) In a products liability case, like this one, the California Supreme Court has held that a nonresident manufacturer purposefully avails itself of the benefits of California when it takes actions 'designed to consummate a business arrangement in which [it] would profit financially by

15

selling its product for use in California,' and both knows and intends that its product will 'enter California and . . . be used' in this state. (*Secrest Mach. Corp. v. Superior Court* (1983) 33 Cal.3d 664, 671 (*Secrest*).)" (*LG Chem, Ltd. v. Superior Court of San Diego County* (2022) 80 Cal.App.5th 348, 362-363 (*LG Chem*).)

"Following *Secrest*, California courts have consistently concluded that a foreign corporation purposefully avails itself of the benefits of the California forum when it knowingly sells and ships its products to California businesses for use in California." (*LG Chem, supra*, 80 Cal.App.5th at p. 363 [citing cases].) Thus, for example, this court recently held that a company who "sold and shipped millions of its [particular] batteries over the course of two years to three California companies for their use," constituting sales that were "substantially remunerative," had "purposefully availed itself of the benefits of doing business in California." (*Id.* at p. 363.) Put another way, "if the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product" in the forum state, the purposeful availment requirement is met. (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 (*World-Wide Volkswagen*).)[10]

As we have explained, the only evidence Plaintiffs submitted in opposition to the motion to quash were printouts from the websites of FCCC

---

[10] Justice O'Connor's plurality opinion in *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County* (1987) 480 U.S. 102, 112 provided the following examples of conduct that might constitute purposeful availment: "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."

16

and Velocity Truck Centers. As FCCC did not assert any evidentiary objections to those documents, we consider their contents.

As relevant to the issue of purposeful availment, the website printouts suggest that FCCC may, to some extent, "serve, directly or indirectly, the market for its product" in California. (*World-Wide Volkswagen*, *supra*, 444 U.S. at p. 297.) Specifically, the printouts from the Velocity Truck Centers website show that Velocity Truck Centers offers for sale two chassis models made by FCCC. Those same website printouts also show that Velocity Truck Centers has several locations in California. From those predicates, along with FCCC's description of itself as "the world's largest manufacturer of diesel walk-in van chassis," Plaintiffs contend they have established that FCCC sells chassis in California. Moreover, the printouts from FCCC's website show that FCCC has relationships with numerous authorized service centers in California to provide service for its chassis in the state.[11]

The sparse evidence provided by Plaintiffs on the issue of purposeful availment makes it difficult for us to analyze whether FCCC has, indeed, purposefully availed itself of the privilege of doing business in California. It would have been preferable for Plaintiffs to have attempted to develop facts about the nature and extent of FCCC's sales of chassis in California, FCCC's advertising in California, and the extent to which FCCC has entered into contracts with service centers in California. The cursory website printouts provided by Plaintiffs are a poor substitute for discovery targeted at issues

_____

[11] FCCC did not submit evidence about its overall activities in California, other than to explain that the chassis involved in the accident here had no connection to California. However, it was Plaintiffs' burden to submit evidence supporting jurisdiction in the first place, not FCCC's burden to submit evidence to defeat it. (*Vons*, *supra*, 14 Cal.4th at p. 449.)

related to purposeful availment.[12]  As will become evident from our subsequent discussion, however, the purposeful availment prong of the specific jurisdiction analysis is not where the most serious deficiencies with Plaintiffs' jurisdictional claim arise.  The more serious problems arise in Plaintiffs' attempt to establish that its claims arise out of or relate to FCCC's contacts with California.  Accordingly, we will assume, for the sake of our analysis, that Plaintiffs have established that FCCC, at least to some extent, sells and provides service for its chassis in California, and that the purposeful availment prong of the specific jurisdiction analysis has therefore been met. With that assumption, we will proceed to the second prong of the specific jurisdiction analysis.

> b.    *Arising Out of or Related to FCCC's Contacts With California*

The inquiry in the second prong of the specific jurisdiction analysis is whether Plaintiffs have established that their claims against FCCC in this lawsuit " 'arise out of or relate to [FCCC's] contacts with the forum.' "  (*Ford Motor*, *supra*, 141 S.Ct. at p. 1026, italics omitted.)  As the Supreme Court explained in *Ford Motor*, "[t]he first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction *without* a causal showing.  That does not mean anything goes.  In the sphere of specific jurisdiction, the phrase

---

[12]    Although it would have been greatly preferable for Plaintiffs to have conducted discovery on issues related to specific jurisdiction, Plaintiffs made no attempt to do so while the motion to quash was pending, and instead propounded lengthy discovery on the merits of their claims.  Accordingly, as we have explained, the trial court was well within its discretion to deny Plaintiffs' request to continue the motion to allow additional time for discovery.

'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." (*Ibid.*, italics added.)

Ford Motor is the Supreme Court's most recent discussion of the second prong of the specific jurisdiction inquiry.[13] (*Ford Motor*, *supra*, 141 S.Ct. 1017.) The facts in *Ford Motor* have some meaningful similarities to this action that make *Ford Motor* an especially useful precedent in determining whether Plaintiffs have established that their claims against FCCC arise out of or relate to FCCC's contacts with California. Specifically, both this case and *Ford Motor* concern product liability claims against a motor vehicle manufacturer (or in this case a motor vehicle component manufacturer),[14]

---

[13]    Prior to *Ford Motor*, the Supreme Court in *Bristol-Myers Squibb Co. v. Superior Court* (2017) ___ U.S. ___ [137 S.Ct. 1773], considered a different facet of the requirement that a plaintiff's claims arise out of or relate to the defendant's contacts with the forum state. In *Bristol-Myers*, out-of-state plaintiffs sued a pharmaceutical company in California even though the plaintiffs did not obtain a prescription for or buy the allegedly harmful drug in California, did not ingest it in California, and did not incur injury or receive medical care for injuries in California. (*Id.* at p. 1778.) Moreover, the drug was not manufactured or developed in California. (*Ibid.*) Under those circumstances, even though the pharmaceutical company conceded it had purposefully availed itself of the privilege of conducting business in California and did sell the drug in California to other consumers, there was an insufficient connection with California to support specific jurisdiction for the out-of-state plaintiffs whose claims had no connection to California. (*Id.* at p. 1782.) *Bristol-Myers* established that "[i]n order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" (*Id.* at p. 1781.) Here, as required by *Bristol-Myers*, there *is* undoubtedly a connection between California and Plaintiffs' claims because the bus accident occurred in California.

[14]    Although, as FCCC urges, there are undoubtedly meaningful distinctions to be drawn in a personal jurisdictional analysis between a motor

19

where the injury-causing accident occurred in the forum state, but the allegedly defective vehicle was sold and manufactured somewhere else.

In *Ford Motor*, two product liability suits were brought against the automobile manufacturer Ford as a result of two car accidents. (*Ford Motor*, *supra*, 141 S.Ct. at pp. 1022-1023.) In both of the cases at issue in the *Ford Motor* opinion, "[t]he accident happened in the State where suit was brought. The victim was one of the State's residents. And Ford did substantial business in the State—among other things, advertising, selling, and servicing the model of vehicle the suit claims is defective." (*Ford Motor*, at p. 1022.) However, "the particular car involved in the crash was not first sold in the forum State, nor was it designed or manufactured there." (*Ibid*.) "Only later resales and relocations by consumers had brought the vehicles to" the forum states, where the accidents occurred. (*Id*. at p. 1023.) Ford argued that the claims against it did not arise out of or relate to its contacts with the forum states because it did not sell, manufacture or design the plaintiffs' cars in the forum states. (*Id*. at p. 1026.) The Supreme Court rejected that argument because the record established *other* connections between the plaintiffs' claims and Ford's activities in the forum states.

The Supreme Court first recited the extensive contacts between Ford and the forum states, including sales in the forum states of the *identical* car models involved in the accidents and alleged to be defective: an Explorer and a Crown Victoria. (*Ford Motor*, *supra*, 141 S.Ct. at p. 1028.) "By every means imaginable—among them, billboards, TV and radio spots, print ads,

---

vehicle manufacturer and a motor vehicle *component* manufacturer, because we conclude that personal jurisdiction is lacking even if we treat FCCC as analogous to a motor vehicle manufacturer such as Ford, we need not (and do not) consider the impact of FCCC's status as a manufacturer of *components* rather than *completed* motor vehicles.

and direct mail—Ford urges [forum-state residents] to buy its vehicles, including (at all relevant times) Explorers and Crown Victorias.  Ford cars—again including those two models—are available for sale, whether new or used, throughout the [forum] States, at . . . dealerships . . . .  And apart from sales, Ford works hard to foster ongoing connections to its cars' owners.  The company's dealers in [the forum states] (as elsewhere) regularly maintain and repair Ford cars, including those whose warranties have long since expired.  And the company distributes replacement parts both to its own dealers and to independent auto shops in the two [forum] States.  Those activities, too, make Ford money.  And by making it easier to own a Ford, they encourage [forum-state residents] to become lifelong Ford drivers."  (*Ibid*.)

The Supreme Court then explained how Ford's forum-state connections related to the plaintiffs' claims.  "Each plaintiff's suit, of course, arises from a car accident in one of those [forum] States.  In each complaint, the resident-plaintiff alleges that a defective Ford vehicle—an Explorer in one, a Crown Victoria in the other—caused the crash and resulting harm.  And as just described, Ford had advertised, sold, and serviced those two car models in both [forum] States for many years.  (Contrast a case, which we do not address, in which Ford marketed the models in only a different State or region.)  In other words, Ford had systematically served a market in [the forum states] *for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States*.  So there is a strong 'relationship among the defendant, the forum, and the litigation' —the 'essential foundation' of specific jurisdiction."  (*Ford Motor*, *supra*, 141 S.Ct. at p. 1028, italics added.)  The Supreme Court explained that "this exact fact pattern (a resident-plaintiff sues a global car company, extensively serving the state market in a

21

vehicle, for an in-state accident)" is "a paradigm example—of how specific jurisdiction works." (*Ibid*.) As the Supreme Court summarized its holding, "When a company like Ford serves a market for a product in a State *and that product* causes injury in the State to one of its residents, the State's courts may entertain the resulting suit." (*Id*. at p. 1022, italics added.)

Here, Plaintiffs' sparse evidentiary submission in opposition to FCCC's motion to quash did not establish the type of facts that *Ford Motor* relied upon to conclude that the plaintiffs' claims arose out of or were related to the defendant's contacts with the forum states. In *Ford Motor*, an important factor was that "Ford had systematically served a market in [the forum states] *for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States*." (*Ford Motor*, *supra*, 141 S.Ct. at p. 1028, italics added.) Specifically, the cars that caused the injuries alleged by plaintiffs were an Explorer and a Crown Victoria. The evidence showed that Ford "advertised, sold, and serviced *those two car models* in both [forum] States for many years." (*Ibid*., italics added.) In contrast, the website printouts provided by Plaintiffs do not establish that FCCC has ever advertised, sold, or serviced the model of chassis at issue in this lawsuit *in California*. At most, the printouts from the website of Velocity Truck Centers suggests that two models of FCCC's chassis are sold in California (the "Freightliner Custom Chassis MT" and the "Freightliner Custom Chassis MT50e"), but not the "2014 Freightliner S2 chassis" at issue in this case. Moreover, there is no evidence that authorized service centers in California have serviced the model of chassis involved in this lawsuit.

We note that although "[m]ost lower federal and state courts considering case linkage in the context of a product liability claim have interpreted *Ford Motor Co.* to require forum contacts pertaining to the

22

*specific product model* at issue in the litigation" (*Adams v. Aircraft Spruce & Specialty Co.* (Conn. 2022) 284 A.3d 600, 617 (*Adams*), italics added), some other courts have concluded that *Ford Motor* does not necessarily require the defendant to have marketed or sold the *precise* model of product at issue in the litigation in the forum state. (See, e.g., *Godfried v. Ford Motor Co.* (D.Me., May 6, 2021, No. 1:19-cv-00372-NT) 2021 WL 1819696, at p. *5 ["it is not *necessarily* a prerequisite for specific jurisdiction that a company market or sell the specific product model at issue in the forum state"]; *Sibley v. Air and Liquid Systems Corp.* (N.D.Cal., June 30, 2021, No. 20-cv-07697-MMC) 2021 WL 2688819, at p. *3 [same]; *Harding v. Cordis Corp.* (Ill.Ct.App. 2021) 196 N.E.3d 514, 523 ["nothing in *Ford* suggests that the only way to demonstrate that a defendant has minimum contacts with a forum state is through sales of the injurious product"].)

"These courts have indicated that forum activity relating to other models of the same product type could provide support for specific jurisdiction, if there is no basis to conclude that there is a material difference between the models." (*Adams*, *supra*, 284 A.3d at p. 618.) "Although not stated expressly, these courts appear to have presumed that, in the absence of evidence to the contrary, other models of the same product type that were produced by the defendant manufacturer could or would share the same design defect, manufacturing defect, or defective warnings as the particular model at issue in the litigation." (*Ibid*.)

We agree that if it were reasonable for us to presume that other similar models of chassis sold by FCCC in California had the same alleged defect as the 2014 Freightliner S2 chassis involved in this litigation, that would likely be sufficient to demonstrate that the Plaintiffs' claims arise out of or relate to FCCC's forum-related activities. But we see no basis for such a presumption

23

on this record. According to Plaintiffs, the alleged defect in the 2014 Freightliner S2 chassis is that it did not have electronic stability and traction control features. Without any evidence on the issue, we cannot simply presume that FCCC's other models of chassis sold in California had or have the same alleged defect. We express no view on whether such a presumption or inference would be appropriate in another factual context.

Plaintiffs' insufficient evidentiary showing becomes clear when contrasted with the detailed evidentiary showing by the plaintiff in a recent products liability case against FCCC's corporate relative, Daimler Trucks North America LLC (Daimler), which sells the Freightliner brand of trucks. (*Daimler Trucks North America LLC v. Superior Court* (2022) 80 Cal.App.5th 946.) Daimler argued that the plaintiff's claims did not arise out of or relate to Daimler's contacts with California because it "did not design, manufacture, assemble, or sell the very Freightliner involved in California." (*Id*. at p. 957.) The court rejected that argument, based on plaintiff's evidence, which showed Daimler's connections to California, including activity specifically related to the model of truck at issue in the lawsuit (the Cascadia). As the court explained, "Daimler advertises Freightliner trucks, *including the Cascadia specifically*, across multiple national and regional media that is also directed to California. Daimler has 32 authorized dealerships in California that sell Freightliners. Customers can order the vehicles at these dealerships; Daimler then assembles the specified vehicles and delivers them to the dealership. Between 4,000 to 5,000 trucks were sold in California each year from 2014 to 2020. Authorized dealerships advertise Freightliner trucks, and Daimler provides the dealerships with information for display advertising purposes. Daimler also sells and ships truck parts to 27 of these authorized California dealerships. The dealerships offer a variety of specialized

24

maintenance and repair services. Twenty-three of the authorized California dealerships service Freightliner trucks. There are 11 truck 'Elite Support' locations in California. These service centers offer customers the services of mechanics who receive 'continual training from the experts at Freightliner' and must meet specific criteria. Nine 'ServicePoint' locations in California offer 24/7 service, repairs, parts, inspections, and trailer maintenance. Seven 'Body Shop' locations in California provide Freightliner crash repair and other repair services not often available in a typical dealership. Hundreds of these service shops are located in the United States." (*Id*. at pp. 950-951, italics added.) The court concluded that "Daimler's activities supporting the sale and service of the Freightliner Cascadia in this state," among other facts, "demonstrate that [plaintiff's] claims 'relate to' those very California activities." (*Id*. at p. 959.) Here, in contrast, Plaintiffs have provided no evidence that FCCC has engaged in any activity supporting the sale and service of the 2014 Freightliner S2 chassis in California or of any other chassis containing the same alleged defects.

Apart from failing to present evidence that FCCC sold the same or similar chassis in California, Plaintiffs also have not identified any other connection between FCCC's California contacts and this lawsuit that would support an exercise of specific jurisdiction. As FCCC established through the Rostenbach declaration, the chassis at issue was assembled in South Carolina and then sold to Champion Bus, Inc. in Michigan. FCCC had no involvement in bringing that chassis, or the bus into which it was ultimately incorporated, into California. There is also no evidence that FCCC was involved in servicing that chassis in California.

Accordingly, we conclude that Plaintiffs have failed to meet their burden to establish the second prong of the specific jurisdiction inquiry,

25

namely, that their claims against FCCC arise out of or relate to FCCC's contacts with California.  The trial court thus properly granted FCCC's motion to quash.

## DISPOSITION

The order granting FCCC's motion to quash and dismissing FCCC from this action is affirmed.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

BUCHANAN, J.